IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL CONWAY | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )   Case Number: _____ |
| | ) |
| CITY OF CHICAGO, COSTAS SIMOS | ) |
| (in his official and personal capacities), | ) |
| and ERIN O'DONNELL-RUSSELL | ) |
| (in her official and personal capacities) | ) |
| | ) |
| *Defendants* | ) |

## COMPLAINT WITH JURY DEMAND

### NATURE OF ACTION

1.      This is a civil-rights action brought under 42 U.S.C. §§ 1983 and 1985(3) for violations of the First and Fourteenth Amendments, as well as under state laws prohibiting retaliation against workers who report or complain about unsafe conditions or about wrongful actions or practices in which their employers have engaged. Plaintiff Michael Conway, an Airport Operations Supervisor II ("AOS II") with Chicago's Midway International Airport ("MDW" or "the Airport"), experienced severe and ongoing retaliation after initially refusing an order by deputy commissioner Defendant Costas Simos (the "No. 2 official at Midway Airport") to lie about poor airfield conditions, and for reporting Simos's illegal order to Chicago's Department of Human Resources, to its Office of Inspector General ("OIG"), and to the Federal Aviation Administration ("FAA").

2.      Simos's dangerous order, which was issued at the behest of Southwest Airlines out of a "financial motivation" and endorsed by managing deputy commissioner Defendant Erin

O'Donnell-Russell, instructed Conway to report airfield conditions as "dry" when they were in fact "wet" (implicitly authorizing certain heavily laden aircraft to land, contrary to FAA regulations) and thus placed the travelling public at risk.

3.      The retaliation Conway experienced included removal of nearly all work responsibilities, suspension of privileges and security clearances, denial of step and cost-of-living increases and of promotion and overtime opportunities, and near-total, management-sanctioned ostracism.

4.      Both OIG and FAA conducted investigations. OIG's investigation, whose results were reported in July 2020, "established that a CDA [Chicago Department of Aviation] deputy commissioner at Midway International Airport [Defendant Simos] disregarded crucial federal safety protocols and the City's Personnel Rules … following a call from a private airline requesting that the airfield conditions be changed due to financial motivation."

5.      According to the OIG report, Simos "acknowledged that the airline [Southwest Airlines] official had a financial motivation for requesting the change in status [of the airfield conditions], because the airline could not include as many passengers on planes landing on a wet airfield at MDW as are permitted for dry conditions, and the airline would therefore lose money if the airfield conditions were not altered."

6.      The report also concluded that Simos "lied to OIG by falsely claiming to have verified the airfield conditions" when he was not even on-site and phone records proved that he spoke to no other operations personnel. OIG "recommended [Simos's] discharge and placement on DHR's [Department of Human Resources] ineligible for rehire list."

7.      The FAA's investigation, which was completed in or around November 2019, "substantiated that a violation of an order, regulation or standard of the FAA related to air carrier safety occurred." It also concluded that the Airport had been untruthful with the FAA during its

investigation. The FAA announced that, as a sanction, "MDW airport will continue to be on a heightened level of FAA surveillance inspection oversight to ensure compliance with airport condition assessment and reporting."

8.      The FAA was particularly concerned with the Airport's culture of intimidation and retaliation, noting its "potential negative effect on safety." It observed that "the vast majority of employees the FAA interviewed requested anonymity out of a fear of retaliation." And it was significant that "the CDA employee who originally contacted the FAA [i.e., Conway] felt it was necessary to raise the underlying concerns with the FAA only and not also with MDW management." "Employees," the FAA admonished, "must always have an opportunity to convey safety concerns without fear of retaliation."

9.      The actions Conway reported constituted violations of 14 C.F.R. 139.339(c)(3) and demonstrated the Airport's failure to competently discharge its responsibility to the traveling public to maintain safe conditions at the Airport.

10.     The Airport's retaliation against Conway—which began within days of his having first refused Simos's order and continued unabated for more than two years—included removal of certain security clearances, being stripped of all previous job duties and responsibilities, management edicts to fellow workers not to speak or interact with Conway, assigning Conway menial and pointless "makework," removal of Conway from the overtime rotation, denial of promotion opportunities, and reversal of scheduled step and cost-of-living increases in compensation, all of which has caused extreme mental distress, humiliation, and irreparable damage to Conway's professional and personal reputation, as well as substantial financial loss.

11.     In 2018, Conway also filed a complaint with the Occupational Health and Safety Administration ("OSHA"), which is currently investigating the Airport's actions as potential

violations of the anti-retaliation provisions of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("Air 21"), 49 U.S.C. § 42121.

PARTIES

12.     Plaintiff Michael Conway lives in Chicago and is a current employee of the City of Chicago Department of Aviation, a self-supported City department responsible for operating, among other facilities, O'Hare and Midway International Airports. Conway's formal title is Airport Operations Supervisor II ("AOS II"). Until his *de facto* demotion in 2018, Conway capably and diligently performed the various functions and duties of that position, including monitoring and reporting runway conditions at the Airport in compliance with Title 14, Part 139 of the Code of Federal Regulations.

13.     Conway has since been relieved of all such responsibilities and, since late 2018, has received only menial "make-work" assignments such as counting cars in the Airport's parking lots.

14.     Defendant City of Chicago is a municipality located in Cook County, Illinois. Its government comprises numerous departments, including the Department of Aviation. The City employs or formerly employed the individual Defendants and is directly and/or vicariously liable for their acts and omissions performed under its customs, policies, or practices.

15.     Until his "resignation" in April 2020, Defendant Costas Simos was a deputy commissioner of the Department of Aviation and, as characterized by the *Chicago Sun Times* and other news sources, the "No. 2 official at Midway Airport." Both individually and in concert with other Defendants, Simos instigated, oversaw, encouraged, tolerated, and/or failed to prevent or abate many of the retaliatory acts described in this Complaint, and/or has responded to such acts and omissions and to Conway's complaints so inadequately as to manifest indifference or

unreasonableness under the circumstances. He is sued in both his official and personal capacities.

16.     Defendant Erin O'Donnell-Russell ("O'Donnell") was Midway's managing deputy commissioner until her "resignation" in July 2019. Both individually and in concert with other Defendants, O'Donnell committed, encouraged, tolerated, and/or failed to prevent or abate various retaliatory acts and omissions against Conway, and/or has responded to such acts and omissions and to Conway's complaints so inadequately as to manifest indifference or unreasonableness under the circumstances. She is sued in both her official and personal capacities.

**JURISDICTION AND VENUE**

17.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331, as this controversy arises under the Constitution and laws of the United States. Venue is appropriate in this district under 28 U.S.C. § 1391, as all acts and omissions complained of occurred in this district; Plaintiff Michael Conway resides in this district; and all Defendants reside in this district or did so reside at the time such acts and omissions occurred.

**FACTS**

**As an Airport Operations Supervisor II, Conway is responsible for, among other things, accurately reporting airfield conditions at Midway.**

18.     Conway has been employed by the City's Department of Aviation since December 1995 and, since 1998, has served as an Airport Operations Supervisor II.

19.     In this capacity, Conway is responsible, according to the official AOS II job description, for "inspect[ing] airfield and airside facilities for overall operational safety [and] ensuring compliance with operational safety and security standards relating to airport operations under 14 CFR Part 139 administered by the Federal Aviation Administration …"

20.     Among the "essential duties" of Conway's position, according to the job description, are

to "[v]isually inspect[ ] the condition and maintenance of airfield facilities and surrounding perimeter (e.g., runways, taxiways, ramps, safety areas) to ensure surfaces are free of safety hazards, obstructions and debris and in good physical condition," to "[p]repare documentation and reports of airfield inspections, findings and irregularities and maintain[ ] daily log of activities / operations logs," to "[i]ssue[ ] and cancel[ ] Notice to Airman (NOTAMS) to provide current information on aviation and airfield conditions including the opening and closing of runways to FAA air traffic control," and to "[m]onitor weather service reports, check surface conditions and temperatures and advise city personnel, contractors and other aviation personnel of weather conditions."

21.     Neither Conway's official job description nor the duties he customarily performs involve his reporting to or otherwise communicating with the FAA, OIG, or other regulatory authorities about management improprieties, irregularities, violations, or illegal conduct.

**Defendant Simos orders Conway to falsify airfield conditions.**

22.     On the morning of February 12, 2018, while at home, Conway became aware through news media reports that Southwest Airlines (one of the air carriers under contract with, and a frequent user of, Midway Airport) had the previous day completely exhausted its supply of aircraft de-icing compound.

23.     At approximately 8:00 a.m. that day, Conway's general manager, David Kaufman, texted Conway about the situation, advising that Southwest Airlines had decided to cancel 98% of its flights out of the Airport after 1:00 p.m. that day.

24.     On Saturday, February 17, 2018, between the hours of approximately 10:00 a.m. and 11:30 a.m., Conway observed Southwest Airlines heavily de-icing at various gate positions. Runway 22L was in use.

25.     As duty supervisor that morning, Conway received a phone call on a recorded line from Defendant Costas Simos, an Airport deputy commissioner, inquiring about the condition of the runways. Conway advised Simos that the field was "Clear/Wet."

26.     Simos then instructed Conway to change the condition on the FAA Digital NOTAM system to "Clear/Dry."

27.     Conway explained that, just 30 minutes earlier, AOS-I Mindaugus Frismantas had observed the field conditions and determined that everything was wet.

28.     Simos retorted that he "didn't care" and demanded that Conway declare the conditions dry. He indicated that the directive had come from the managing deputy commissioner, Defendant Erin O'Donnell, and emphasized that "Southwest Airlines needs our help!"

29.     After hanging up with Simos, Conway called Frismantas and asked that he again inspect the airfield and report what he observed to the operations office. A few minutes later, Frismantas again confirmed, on both the recorded radio and recorded phone lines, that field conditions were Clear/Wet.

30.     Conway himself then drove runway 22L and taxiway Y to inspect and test the surface conditions. At speeds ranging from 20 mph to 70 mph, he conducted a series of "vehicle action braking tests," which involved his purposely engaging his vehicle's anti-lock brakes to initiate lengthy skids. Due to the slick conditions, his vehicle slid over a considerable length of pavement and crossed two runway intersections. (These tests are accepted practices.) In this way Conway was able to confirm not only that the entire airfield was wet but that portions, including runway 22L, were extremely slick with de-icing compound.

31.     Runway sensors throughout the field also indicated that the field was wet at the time.

32.     Simos called Conway a second time the morning of February 17 demanding that Conway change his conditions report. "Did you do it?! Did you do it?!," Simos repeatedly asked.

33.     Back at the office, Conway explained to another manager what Simos was demanding that he do. The manager responded with words to the effect that Simos was the deputy commissioner and that Conway must do as he was told.

34.     Conway also called his supervising manager, Dave Kaufman, who was at home at the time and who likewise advised Conway that he had better obey Simos's directives or risk being terminated for insubordination. "How can you be sure," Kaufman asked him, "that regulations had not been changed to allow pilots to call runway conditions?"

35.     Conway was extremely reluctant to report wet runways as dry simply as a favor to Southwest Airlines. He knew that a false report of this nature could be catastrophic, because not only Southwest Airlines but other airlines would rely on that misinformation, and because he knew that certain aircraft are prohibited from landing on wet runways and would run the substantial risk that they would be unable to stop. Conway did not want the City of Chicago to bear responsibility for misinforming the airlines and inviting tragedy.

36.     Due to the extreme pressure Simos had applied on him, being admonished by managers to obey orders, and having been told by Simos that the directive came from Defendant O'Donnell herself, Conway ultimately relented and reported the field condition as Clear/Dry.

37.     The events of February 17, 2018 were the subject of much discussion among Conway and his managers the following week. Conway couldn't help but wonder whether Southwest's and Simos's insistence that runway conditions be falsely declared dry (which enabled more and heavier aircraft to land), constituted an effort to "make up for" the revenue Southwest had lost the previous week when its aircraft were grounded due to the depletion of de-icing compound.

38.     At a shift briefing with Kaufman and others that week, Conway reported that the only significant development was that the field was now Clear/Dry. Kaufman, who had his back to the door at the time, sarcastically responded "Yes, as ordered!" Simos walked in the door just as Kaufman was saying this, and then turned to Conway and fumed, "What is your fucking problem with Clear and Dry?!"

39.     Conway responded that he didn't have a problem with it and that they were talking about current runway conditions as part of that day's briefing, not conditions the previous Saturday.

40.     He did use the occasion, though, to ask Simos what had happened that Saturday. Simos was not in the mood to answer questions. He tersely reminded Conway that "I am the fucking deputy commissioner. You will do what you are told and not ask fucking questions!"

41.     Kaufman appeared to defuse the situation somewhat when he told Simos he wanted to speak with him in his office, and the two men left. When they returned, Simos appeared to have simmered down a bit and Conway said he too needed to speak with Simos but without his screaming and storming off. "What you ordered me to do on Saturday was wrong," Conway said. "I left my shift frightened that we would have an aircraft slide off the end of the runway." Simos too expressed concern, but of a different sort: he remarked that, if something like that were to happen, he might lose his job and his pension.

42.     Conway, who had confirmed that there were no new regulations or procedures allowing pilots to call airfield conditions or dictate how they are reported, told Simos he would not comply with any such order again. "You are making me put my name on that NOTAM," Conway said, "and believe it or not, I am looking out for your best interests as well as everyone else's."

43.     Simos told Conway he understood and assured him he wouldn't put Conway in that position again. Conway shook Simos's hand and believed the situation had been put to rest. Kaufman and another manager were in the room for this entire exchange and heard Simos's assurance.

44.     According to other operations personnel, however, during late February and early March Simos continued to call in from home and order them to falsify runway conditions, i.e., to change observed conditions from Clear/Wet to Clear/Dry. On several occasions during this period, Conway picked up the tower's "ATCT [air-traffic control tower] ring-down phone" and responded to queries from the tower about whether the runways were still wet; and if they were, Conway would confirm that fact.

45.     The inquiries during this period became so frequent that, one day in late February or early March, Conway asked Kaufman, Joe Ambrosia, and another manager whether they thought it might be a good idea to take the chief Southwest Airlines pilot out on the field to show him the Clear/Wet runways that his pilots were asking be called Clear/Dry. He received a collective, "Yeah; that would be a good idea" from all three men.

46.     On March 17, 2018, Conway picked up a "ring-down" call from the tower supervisor (initials "DL") relating that Southwest Airlines pilots were calling on the frequency and stating that runway 4R was Clear/Dry. The supervisor told Conway that he and others in the tower could plainly see from their vantage point that the runway was wet and knew that operations personnel were also calling it wet.

47.     Conway informed the supervisor that this problem had been trending for weeks and mentioned that he would talk with Southwest Airlines' chief pilot.

48.    When Conway called the chief pilot's office, he ended up reaching Assistant Chief Pilot Colin Scantlebury. He arranged to take Scantlebury out on the field, driving on Taxiway Y and Runway 4R and showing him the wet conditions (conditions similar to those he observed the morning of February 17). It was Runway 4R, Conway told Scantlebury, that his pilots had been calling dry all morning. The two men observed and talked about the pervasive de-icer fluid on the pavement. They also discussed an unfortunate 2005 accident in which a plane slid off the runway, through a fence, and into a neighborhood intersection, killing a child. Conway mentioned nothing about the earlier ordeal with Simos.

49.    Asked for his opinion of the runway conditions, Scantlebury told Conway that he was "300% correct" in his assessment that the runway was wet with de-icer. And when Conway asked if a B737-800 aircraft would have performance issues under those conditions, Scantlebury responded that his pilots would be able to land a fully loaded B737-800 "all day long" on those wet runways. Asked why his pilots were calling the runway dry if they didn't have to, Scantlebury shrugged his shoulders and said he didn't know. He did say, though, that he would speak with Chief Pilot Nick Caulfield and Erin O'Donnell about the matter.

**Conway begins to face retaliation.**

50.    On March 20, 2018, Kaufman called Conway into his office and, in front of AOS-II Glenn Martin, gave him a verbal reprimand for "Conduct Unbecoming a City Employee" for "making derogatory statements to a Southwest pilot" about the performance of his co-workers.

51.    Conway explained that the charge was false and made no sense, and recounted what he and Scantlebury had in fact talked about. He asked to have the union business manager present but was told it wasn't a union matter. And when he asked to have Scantlebury come down and confirm the substance of the conversation, Kaufman told him that wasn't allowed.

52.     Later that day, Kaufman confessed that Conway had done nothing to warrant a reprimand, and related that it was a furious Simos who had called him, demanding that Conway be punished for bringing up the subject of runway conditions with a pilot.

53.     Kaufman told Conway that Simos had ordered him to prepare the false narrative. He was "just the messenger" and his "hands were tied," Kaufman lamented. He urged Conway to simply accept the verbal reprimand and allow Simos to settle down. The reprimand would be removed from Conway's file in 18 months, Kaufman assured him. Kaufman did tell Conway that, per Simos, he (Conway) was not permitted to speak with any pilots.

54.     A few hours later, Kaufman again called Conway into his office and, in front of O'Neill and Ambrosia, gave him a "direct order" that he was forbidden from talking to any of his co-workers about the subject of Clear/Wet versus Clear/Dry runways, explaining that it was "bad for morale." Later, Kaufman again confessed that it was Simos who had instructed him to pass along that comment to Conway.

55.     Joe Ambrosia, too, instructed Conway to stop stirring things up with talk of wet vs. dry runways. "This issue is much bigger than you," Ambrosia warned. "It's bigger than Costas, and it's bigger than Erin. It's bigger than you could ever imagine."

56.     In the latter part of March 2018, Kaufman, and other managers went around to all the operations personnel instructing them on the criteria for calling a runway dry, falsely implying that there was "confusion" about the issue and that they may have been incorrectly calling runways wet all along. In fact the criteria had always been clear, having been promulgated and endorsed by the FAA.

57.     Throughout the spring and summer of 2018, Simos continued to demand that operations personnel falsify airfield conditions.

58.     In July 2018, the Airport brought on a college intern named Grace McKee to observe operations. Kaufman told Conway that, again per Simos, he was not to speak to her or take her out on the runway. Kaufman commented "Isn't that shitty?" and apologized for Simos's insulting order.

59.     It was also at about this time that Simos and O'Donnell began excluding Conway from meetings in which he used to participate as part of his job responsibilities. They also excluded him from training and most other activities.

60.     Having observed Simos and O'Donnell turn the same kind of "cold shoulder" to other employees who they believed had crossed them, Conway knew that the same retaliatory treatment would continue indefinitely. Only when Simos was on vacation, as he was in August 2018, did Kaufmann once again permit Conway to participate in essential activities. But that privilege ended immediately upon Simos's return from vacation.

61.     The situation put Conway under so much stress that his blood pressure became elevated to dangerous levels. His stress was particularly acute on September 4, 2018, as he realized that Simos was due to return from vacation that morning and would likely demand that Conway once again falsify airfield conditions. While driving the field, Conway inadvertently crossed a runway that was not in use. The crossing caused no harm and posed no risk.

62.     The incident was nevertheless very upsetting to Conway, who had a perfect safety record for his entire 22-year tenure with the Airport. He reported the incident to Kaufman and was told he had to re-take his written and driving tests to retain his airfield badge. He passed both tests with 100% scores. His doctor nevertheless advised him to get evaluated before returning to work. Conway put in for FMLA leave and returned to work three weeks later.

63.     Kaufman later informed Conway that, under a new policy, he might be subject to suspension for what had happened. He added, though, that because it was a comparatively minor infraction that caused no harm, and because it had a medical explanation, Conway would most likely just receive a letter of reprimand. But Kaufman also mentioned that it would be up to Simos to decide the discipline.

64.     There was no such "new policy"; none had ever been communicated to operations personnel. The putative "policy" was directed at Conway only. Employees accused of similar infractions never received suspensions. Just that summer, an employee named Carolyn Redmond crossed an *active* runway in front of an aircraft that had just landed, yet received no discipline at all. Historically, suspensions at Midway had been reserved for far more major infractions, such as unauthorized crossings of active runways that cause a takeoff to abort.

65.     Nevertheless, on October 16, 2018, Simos and O'Donnell indeed imposed a five-day suspension, which Conway began serving on November 17. Conway learned he could seek to arbitrate the suspension, which was a completely unprecedented disciplinary measure for such a minor infraction, and so asked to do so. But he did not receive a response to his request until after the 30-day-appeal period had expired, and then was denied his right to appeal on timeliness grounds.

66.     And at about this time, Conway learned from certain co-workers that Simos had approached them and asked them to prepare denigrating statements about him. They reported that Simos appeared to get upset when they expressed reluctance to write what Simos instructed them to say.

67.     All these actions were taken in retaliation for Conway's having initially refused Simos's order to falsify runway conditions and for his having complained to Simos about the matter.

**Conway reports relevant events to the City's HR department, to the City's Office of Inspector General, and to the FAA, and then experiences enhanced retaliation.**

68.     In mid-September 2018, CDA personnel director Argentene Hrysikos contacted Conway several times. She wanted to discuss Conway's FMLA leave and associated paperwork. When Conway went to O'Hare to meet with her, Hrysikos asked him what was going on at Midway and what he believed was causing so much stress. Conway described the troublesome events, including how Simos had insisted that he and others falsify airfield conditions. Hrysikos was appalled. She exclaimed "Oh my God, he's going to kill someone!" "It looks like Simos is going to have to retire much sooner than he had planned!," Hrysikos added.

69.     Fully appreciating the seriousness of the matters Conway was relating, Hrysikos instructed Conway to report his concerns to "whatever agency is responsible for airport safety." She also told him to report them to the City's Inspector General's Office and to *the City's* personnel department downtown. When Conway asked Hrysikos if the two of them could walk down the hall and speak with CDA Commissioner Jamie Rhee, Hrysikos replied "No, no, no! I'll talk to the commissioner. You just do what I told you to do!"

70.     On September 20, 2018, Conway called the FAA and spoke with Birke Rhodes, a manager of airport safety and operations for the agency's Great Lakes region. And on October 1, the FAA interviewed Conway, who provided a timeline of relevant events. The results of the FAA's investigation, completed in November 2019, are summarized below.

71.     Also in September 2018, Conway reported relevant events to the Chicago OIG, which also interviewed Conway. The results of its investigation, completed July 2020, are also summarized below.

72.     The Airport was abuzz with speculation about who had blown the whistle on its misdeeds. But according to the personnel director, Simos, O'Donnell, and the entire executive

staff were already convinced it was Conway. (Despite having instructed Conway to report his concerns to the various agencies, Hrysikos seemed surprised that he had done so. "Did you go to the FAA?," she asked. "Good luck," she added while patting him on the shoulder.)

73.     In October 2018, the Airport launched an investigation in which employees would be summoned, one by one, into a meeting for interrogation by the City and its lawyers.

74.     Conway was first up. Not wishing to put the City to unnecessary burden and expense, and hoping to forestall further retaliation, he immediately acknowledged that it was he who had reported to the agencies. He expressed apprehension, though, about the fact that Simos typically waits months before retaliating against an employee for disobedience or a perceived slight. In this way, Conway related to the group, Simos believes he can plausibly deny any connection between the two events. For example, after AOS I Laura Aye sued him for sex discrimination, Simos waited months before fabricating a story, and launching an investigation that falsely alleged, that Aye had pressured and intimidated Rossi Contractors to hire her son.

75.     Over the course of the next two months, Simos instructed other staff members to follow and observe Conway as he conducted airfield inspections. The transparent purpose of this surveillance was to intimidate Conway and to try and acquire grounds to invalidate his observations for later use against him.

76.     Kaufman and other managers also told Conway that Simos and O'Donnell had instructed them to report every conversation they had with Conway, and that operations supervisors had been instructed to do the same.

77.     Conway himself noticed these reports being made in real time. While talking with Conway, operations supervisors frequently engaged in text-message exchanges with Simos, appearing to report on the conversations in which they were then engaged with Conway. Based

on these supervisors' curt and distant attitude and demeanor toward Conway during and after these exchanges, Conway reasonably believed the exchanges to be part of the Simos-ordered surveillance.

78.     Simos took every opportunity to degrade and humiliate Conway. For example, on October 19, 2018, Conway was busy assisting fire officials re-route traffic around an accident that had occurred between an aircraft and a Southwest Airlines service truck. Simos pulled up in his car and, in front of all present, began yelling at Conway to stop talking to people. He then called manager Veronica Martinez, falsely told her that Conway was "doing absolutely nothing," and instructed her to call Conway back to the office and send a subordinate out to help instead.

79.     Staff surveillance of Conway continued throughout the fall of 2018, with a concerted effort being made to discredit his airfield observations.

80.     On December 8, 2018, operations supervisor Ildephonso Baerga told Conway that, the day before, a mere 20 minutes after Conway had observed and reported the airfield wet with de-icer, Simos instructed Frismantas and airport manager Terry Thomas to declare the entire airfield dry. They did so. But eight hours later, when the next shift arrived, operations personnel reversed that determination and again declared the field wet with de-icer. No additional de-icing chemicals had been used on the airfield that day.

81.     Baerga told Conway that he'd better watch his back. He said "the plan" was to make Conway look crazy and to look like he didn't know what he was doing.

82.     On December 11, 2018, Defendant O'Donnell called Conway into to her office and, in front of Kaufman and Ambrosia, began loudly chastising him. She claimed to have proof that, on at least two occasions, Conway had not in fact driven two main runways before reporting them wet. She accused him of being "a liar, deceitful and deceptive." In fact Conway had merely

followed widely observed protocol, endorsed by the FAA, permitting airfield declarations to be made based on representative observations, and so informed O'Donnell.

83.    O'Donnell was unwavering. She told Conway she was having his "red stripe" removed from his badge. This meant that he could no longer drive the "movement areas" of the airfield (i.e., the runways and taxiways) without an escort. Conway would have only a "yellow stripe," permitting him unescorted passage only on the airfield's "non-movement areas" such as service roads.

84.    Conway, whose inspections are among the most thorough of anyone in operations, was singled out for this mistreatment. The discipline O'Donnell imposed was not only unprecedented but was completely unrelated to Conway's alleged "offense," i.e. not driving entire runways before calling them wet. To Conway's knowledge, this was the only time in his 23 years of service that an AOS had been stripped of his or her red stripe (though it has happened one time since—to a motor-truck driver who committed a runway incursion and who, when offered his red stripe back, refused it because of the way he had been treated).

85.    At the same December 11, 2018 meeting, O'Donnell also stated she would make sure that Conway was never the senior person on duty, and that she was going to change other people's days off to enforce the restriction. She instructed Dave Kaufman and Joe Ambrosia to "Make sure this happens, gentlemen." Joe Ambrosia had his days off changed so he could "babysit" Conway.

86.    O'Donnell made sure Conway understood that she was responsible for imposing these disagreeable measures on him and that she was proud of it. As she left the room, she turned to Conway and said "I came up here today to let you know that it's *me* who's doing this to you and not *him*, not Costas."

87.    After the December 11 meeting, Joe Ambrosia forbade Conway from working in the office. He told Conway to instead stay outside, check fuel trucks, and sit parked at the terminal ramp to "watch aircraft push back out of the gates."

88.    Over the following several months, Defendant O'Donnell gradually stripped Conway of all his duties except the most menial, such as counting cars in the Airport's parking lots, checking bathrooms for toilet paper and paper towels, and looking for soda spills in the terminal. These were extremely menial duties that required no training or skill.

89.    On January 1, 2019, Ambrosia informed Conway that his new assignment, which would be in effect indefinitely, was to check parking lots and garages and to periodically check fuel trucks.

90.    On January 2, 2019, Conway reported that the truck he normally used had a malfunctioning seatbelt. Later, the fleet-maintenance manager told him that Simos had been in his office asking if there was a way to blame Conway for the broken buckle. The manager told Simos that there was not, and that the issue was very common in Ford Explorers. He later told Conway that he knew what Simos was up to, confiding that Simos would never come to the maintenance office just to ask about a minor issue like a seatbelt.

91.    Although Conway had, for his entire career, been part of the staff's overtime rotation, in January 2019 he began to be excluded. When he asked why, Kaufman told him that Erin O'Donnell had decided that, because he lacked a red stripe on his badge—the stripe of which she herself had stripped him—Conway should be removed from the overtime rotation. But having a red stripe is not a precondition of overtime eligibility: Conway is aware of other yellow-stripe operations personnel who have received overtime.

**Conway is formally disciplined on trumped-up charges.**

92.    Conway believed he understood that, following removal of his red stripe, he was not permitted to drive the "movement areas" of the airfield without an escort. But managers regularly required him to drive from the service road to movement areas such as "the melter." So Conway sought clarification from Kaufman on the matter. Kaufman confirmed in a recorded phone conversation (all conversations with the office are recorded) that Conway was allowed to drive in these areas if he had an escort and if his duties required it.

93.    Despite Kaufman's recorded assurances, Conway got in trouble for doing exactly what he was told to do. On February 1, 2019, for example, airport manager Veronica Martinez instructed Conway to "get in line" with equipment in front of her while the two crossed taxiways and runways. (Conway was the senior AOS on duty.) But afterward she told Conway he was in trouble for being on the airfield.

94.     On February 22, 2019, O'Donnell issued a pre-disciplinary notice to Conway for his having, on two occasions, driven the airfield without her express permission. On each listed occasion, Martinez had expressly instructed Conway to do what he did. Despite purporting to rely on the recorded conversation between Conway and Kaufman, O'Donnell in her notice flatly contradicted Kaufman's assurances that Conway could drive on certain portions of the airfield if his duties required it and he had an escort.

95.    The notice also falsely alleged that, on one of the occasions at issue, Conway "used threatening and intimidation factors to force an MTD [motor truck driver] to perform the escort of his vehicle." The allegedly threatened driver, whose union became involved in the incident, emphatically denied that Conway did any such thing.

96.     On February 25, 2019, Conway updated his report to the FAA to include evidence
(including runway photographs and witness contact information) that Defendant Simos
intentionally altered the Airport's field conditions on December 7, 2018.

97.     On March 15, 2019, Conway received another pre-disciplinary notice concerning the
airfield inspection he had performed on December 4, 2018. The notice alleged that Conway had
violated unspecified federal, state, city, and Aviation-Department regulations. He had not.

98.     Although disciplinary hearings were initially scheduled for the violations of which
Conway was notified on February 22 and March 15, 2019, each was cancelled or postponed.

99.     The violations Conway was alleged to have committed shifted with each pre-disciplinary
notice, with earlier ones falling by the wayside and others fabricated to take their place.

100.    On July 9, 2019, O'Donnell issued yet another pre-disciplinary meeting notice, revamped
to include only those accusations O'Donnell believed could be made to "stick." Gone was any
mention of how, on December 4, 2018, Conway had allegedly reported airfield conditions as
"wet" without driving all surface areas. (In fact Conway had driven runway 31C, from which he
could observe that all runways were wet, a practice the FAA endorses.) Also gone was any
mention of Conway's alleged "threats" to a motor-truck driver (who refused to cooperate in the
Airport's sham investigation). Instead the notice identified nine separate "policy and procedure
violations" Conway was accused of committing. Each was trumped up and completely false.

101.    Conway received a 15-day suspension, which he served from July 30 to August 13, 2019.
The hearing officer, Mike Landers, advised Conway not to appeal because it would do no good
and because the more he pursued things legally, the worse things would get for him. Landers told
Conway that, at the meeting to decide Conway's punishment, both O'Donnell and Simos were
demanding that he be terminated, adding that they did not care what OSHA or the City Inspector

General ultimately decided to do. But "Calmer heads prevailed, thank God," according to Landers, and everyone settled on a suspension instead. But future infractions, Landers related, would result in a 30-day suspension, followed by termination.

**Retaliation against Conway grows worse in late 2019 and early 2020, and includes reversal of a scheduled step increase in his pay and being prevented from testing for a promotion for which he would have been a strong contender.**

102.    Conway continued to experience serious retaliation throughout 2019 and into 2020. Among the retaliatory acts that occurred early in this period were the following:

- Although a late-2018 policy required all AOSs to undergo a recertification process, and although all other AOSs completed the process in April 2019, Conway was never told about the process. When he inquired with the personnel department, they refused to talk to him about it;

- Similarly, Conway was the only AOS not notified about, and consequently the only AOS who did not undergo, the required "Notice to Airman" (NOTAM) certification and training on the new vehicle laptops;

- Joe Ambrosia told Conway that he was required to undergo "special" Part 139/303 training (referring to the relevant Code of Federal Regulations provisions). But when Ambrosia, on his day off, learned that Conway was in the office viewing one of the required training videos, he went to the office and booted Conway out, telling him to go check parking lots;

- At the same time, Ambrosia, in a fit of pique, also arbitrarily stripped Conway of the responsibility to check fuel trucks;

- At the end of June 2019, when it came time to renew Conway's already-diminished airfield badge, the Airport further reduced his airfield privileges by removing escort

privileges from his yellow stripe. This, to Conway's knowledge, made him the only yellow-stripe Airport employee unable to escort contractors, emergency vehicles, etc., through security and onto the airfield's service roads and other non-movement areas.

- At O'Donnell's July 30, 2019 "retirement" party, Veronica Martinez ordered Conway out of the building and off the airfield before the party started. She told him to stay in the terminal and not return until it was time to punch out. Conway was humiliated.

103.    At a September 11, 2019 meeting among Simos, Ambrosia, Martinez, Kaufman, and Terry Thomas, Simos told the attendees that all further discipline against Conway would be handled by Mike Landers. He also told Kaufman that he was not to be involved in any way and, indeed, that he was not under any circumstances to communicate with Conway.

104.    Upon checking his September 22, 2019 paystub, Conway realized that he had not been receiving either his scheduled 2019 step increase or his 2019 cost-of-living allowance. Payroll clerk Cesar Pinto told Conway that "something" in Conway's file had been deliberately erased and that he had never seen anything like it before. Simos had taken possession of Conway's file from Kaufman in January 2019. Kaufman suspected that Simos was trying to deny or reverse Conway's raise. But Kaufman was not told what was happening and was ordered to stay out of the matter.

105.    Conway later discovered that Simos had reversed the routine step increase he was scheduled to receive in 2019, a personnel action that is almost never taken (even for employees under suspension) and that requires a meeting and a performance improvement plan (PIP) designed to give the employee another opportunity to earn the increase.

106.    When Bob Chianelli of the union inquired on Conway's behalf, the City's personnel department lied and told him that the required meeting had taken place and that Conway was

indeed under a PIP. Chianelli exposed the lie by confronting the department with the lack of any documentation of any PIP or of the required six-month follow-up.

107.    Conway was ultimately—in January 2020—reimbursed for the missed pay increase. But because the reimbursement was considered a "bonus" and not part of his regular pay, Conway was told, it was subject to a "special tax" of 45%.

108.    In early November 2019, the Airport advertised an opening for the position of assistant chief operations supervisor, a promotion in which Conway was very interested and for which his 23 years of relevant job experience made him eminently qualified.

109.    Conway's initial application to test for the position was rejected due to an unexplained, purported problem with his employee number. A hiring recruiter later told him that his number had been entered correctly after all, but that he had not been invited to take the test and that his application was still "under consideration." All interested persons except Conway were allowed to take the test on February 5, 2020.

110.    After the union pressed the issue, Conway was finally able to take the test on March 4. But because he had not been allowed in the office, he was not able to view the training videos and thus was at a distinct disadvantage. (He recalled how, the previous fall, Joe Ambrosia had punished him for trying to do so.) And when he asked if he could take the videos home to view, multiple supervisors refused even to answer him, advising only that they were not allowed to speak to him.

111.    Well into 2020, Conway continued to be followed and surveilled as he performed his duties. On March 13, after finishing his parking-lot "inspection," Conway parked his car in a City lot and, while on break (which he was allowed), walked across the street to buy a cup of coffee. But upon his return Veronica Martinez radioed him for a "meet" and concocted a story

that someone had called security to report a suspicious person walking up and down 55th Street. Conway checked with security and learned that there had been no such call. When pressed, Martinez confessed that there had been no security report and that Simos was still ordering other employees to tail Conway and report back to him about his whereabouts and activities.

112.    On March 16, 2020, the Airport offered to return Conway's red stripe in exchange for his dropping the appeal of his 15-day suspension. The extortionate offer was unacceptable to Conway, who had done nothing wrong. He was also reluctant to waive his appeal rights because it was his understanding that, if allowed to stand, the suspension may render him ineligible for any promotions.

### The OIG's report

113.    In response to Conway's September 2018 report, OIG launched Investigation No. 18-0738, the results of which were published on July 16, 2020 in the office's second-quarter 2020 report. Although the report does not identify the actors by name, various media outlets report that undisclosed sources at Chicago City Hall have confirmed their identities, which therefore can be freely and accurately reported here.

114.    As an indication of the gravity of the violations uncovered, the Midway fiasco was one of only two investigations (among the hundreds addressed in the report) highlighted in OIG's one-page press release. As summarized there, the investigation

> established that a CDA deputy commissioner at Midway International Airport [Simos] disregarded crucial federal safety protocols and the City's Personnel Rules. Specifically, the deputy commissioner ordered a change to the reported airfield conditions at MDW from "wet" to "dry," following a call from a private airline requesting that the airfield conditions be changed due to financial motivation. OIG recommended discharge and placement on DHR's ineligible for rehire list. The deputy commissioner subsequently retired after CDA received OIG's report. In response,

CDA referred the deputy commissioner for placement on the ineligible for rehire list.

115.    Simos, according to the report, "acknowledged that the airline [Southwest Airlines] official had a financial motivation for requesting the change in status [of the airfield conditions], because the airline could not include as many passengers on planes landing on a wet airfield at MDW as are permitted for dry conditions, and the airline would therefore lose money if the airfield conditions were not altered."

116.    "Further," the report continued, "during the investigation into this incident, the deputy commissioner [Simos] lied to OIG by falsely claiming to have verified the airfield conditions by contacting a different AOS. However, phone records and recorded phone calls at CDA revealed that the deputy commissioner did not speak with a different AOS prior to ordering the AOS [Conway] to change the conditions."

117.    The OIG recommended that Simos be terminated and placed on the City's "ineligible for rehire" list.

118.    Simos elected to "resign" rather than face the OIG-ordered termination. His last day was April 22, 2020.

**The FAA's findings**

119.    Conway's September 20, 2018 report to the FAA spawned an intensive investigation of the Airport, Case Nos. 2018GL800103 and EWB19510. Many of the safety-related issues Conway raised also informed the FAA's conduct of its annual airfield-certification process, which took place in June and July 2019 and which uncovered numerous serious deficiencies with Airport operations. Defendant O'Donnell "retired" immediately after the conclusion of that process.

120.     Some 14 months after Conway blew the whistle, the FAA issued its findings. On December 10, 2019, it notified Conway that "The Great Lakes Regional Airports Division has completed their investigation of the air carrier safety issues in Case #EWB19510. *The investigation substantiated that a violation of an order, regulation or standard of the FAA related to air carrier safety occurred*. Accordingly, the FAA is taking appropriate corrective and/or enforcement action. Our office will monitor these actions until complete." (Emphasis added.)

121.     The FAA had already prepared a November 24, 2019 formal report of its findings. After interviewing 16 Airport employees (some of them several times because of pervasive inconsistencies) and three Southwest Airlines employees, the FAA confirmed Conway's account of the February 2018 events in its entirety.

122.     The report began by noting how important the issues were that Conway had brought to the FAA's attention. "Because of the seriousness of the allegation, FAA also referred this case to the DOT Office of Inspector General (OIG)." The FAA also noted that the City of Chicago Inspector General was investigating the matter, "in particular, the whistleblower claim of retaliation against Michael Conway."

123.     Addressing Conway's allegation that "Airfield Operations Deputy Commissioner Costas Simos directed AOS to alter or change Field Condition Reports FICONS)," the "FAA determined that it is likely that airport management directed staff to change airfield conditions without on-site airfield verification on February 17, 2018." As a sanction, the FAA announced that "MDW airport will continue to be on a heightened level of FAA surveillance inspection oversight to ensure compliance with airport condition assessment and reporting."

124.     The FAA further reported that "[s]ome of the CDA employees interviewed

communicated inaccurate airfield condition reporting at MDW, including practices that overrode airfield assessments from AOS staff in addition to changing airfield condition reports without onsite verification."

125.     These practices were particularly problematic at Midway Airport. "Accuracy of runway condition reporting at MDW is particularly essential due to the shorter runway lengths. The difference between reporting 1/4" of snow and 1/8" could determine whether certain airlines or aircraft can operate out of MDW."

126.     Disturbingly, the inaccuracies appear to have been the product of the Airport's culture of intimidation and retaliation: "some of the employees stated that management created a work environment that discouraged staff from openly communicating and addressing safety issues, including decision-making involving airfield condition reporting."

127.     The FAA also communicated its findings in a strongly worded letter to the Chicago Department of Aviation. It was sharply critical of the Airport's defensiveness and lack of transparency during the investigation. The Airport, the FAA noted, "did not consistently follow the spirit of full cooperation and transparency …" While "MDW management put significant effort into defending its personnel and procedures," "it was not apparent to the FAA that a similar level of effort was going into investigating whether the concerns brought forward in the employee's complaint were valid."

128.     The Airport also misled the FAA. After requesting that investigative interviews be delayed to accommodate the schedule of an attorney it said would be representing the involved Airport employees, the Airport ultimately brought an attorney who confessed he would be representing the City and *not* any employees. The attorney, consequently, was not invited into the investigative interviews.

129.    According to the FAA, the Airport's "somewhat uncooperative stance continued throughout the investigation, with slow turnaround times on some requests and, at times, contentious exchanges between CDA and FAA personnel." "The FAA has repeatedly asked the CDA to share any details from its investigation, yet the CDA has not provided this information."

130.    Turning to the substance of Conway's allegations, the FAA noted that "numerous employee interviews" showed "instances where a small group of individuals controlled the airfield condition reporting, [which] was not in line with an open and transparent operation." "It is necessary, and it is the FAA's expectation, that MDW has numerous trained individuals who are capable of independently assessing and independently reporting airfield conditions. … Airfield condition reporting should not reside at the level of a Deputy Commissioner." Defendant Simos, in other words, should not be able to overrule the educated, considered judgment of an on-site specialist trained in evaluating and reporting airfield conditions.

131.    Although Conway possesses only a redacted version of the FAA's letter, from which Airport employee names have been expurgated, the document nevertheless confirms Conway's account of the events of February 17, 2018. It confirms, in particular, that on that date "Southwest Airlines request[ed that] the reported wet runways be re-evaluated to ensure that they were not dry." (The context of the relevant paragraphs makes clear that "intense discussions occurred" on the subject between Conway and Simos.) "After several exchanges," the letter continues, Conway "changed the airfield conditions from wet to dry at the direction of" Simos "despite [Simos's] not being present on the airfield at the time." It was "the FAA's assessment, based on its investigation," that Simos's "claim to have called an onsite [observer] appears to be untrue …" and that "airfield conditions at MDW were incorrectly changed from wet to dry without onsite field verification."

132.    As noted above, the FAA was particularly concerned with the Airport's culture of intimidation and retaliation, noting its "potential negative effect on safety." It observed that "the vast majority of employees the FAA interviewed requested anonymity out of a fear of retaliation." And it was significant that "the CDA employee who originally contacted the FAA [i.e., Conway] felt it was necessary to raise the underlying concerns with the FAA only and not also with MDW management." "Employees," the FAA admonished, "must always have an opportunity to convey safety concerns without fear of retaliation."

CLAIM 1

**FIRST AND FOURTEENTH AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983 (AGAINST ALL DEFENDANTS, AND AGAINST BOTH INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL AND PERSONAL CAPACITIES)**

133.    Conway incorporates all previous allegations.

134.    Conway is a public employee.

135.    Conway engaged in various forms of protected speech and conduct as described above.

136.    Neither Conway's official job description nor the duties he customarily performs involve his reporting to or otherwise communicating with the FAA, the OIG, or other regulatory authorities about management improprieties, irregularities, violations, or illegal conduct.

137.    Conway's speech and conduct—in particular his initial refusal to misrepresent airfield conditions and his subsequent reports to the FAA and the Chicago OIG—concerned critical matters of public safety and concern. In engaging in such speech and conduct, Conway was acting not in his capacity as an employee of the Chicago Department of Aviation but rather in his capacity as a concerned private citizen.

138.    It has been clearly established law for decades that public employees have the right to communicate about matters of public concern and that public officials may not retaliate against people, including public employees, for protected speech. All public officials are charged with

knowing that public employees may not be disciplined for engaging in protected speech on matters of public concern. This prohibition applies despite any potentially or arguably contrary management policies or directives, or policies or directives requiring "confidentiality" or "loyalty," as such policies and directives cannot supersede employees' constitutional rights.

139.    Both individually and in concert with one another, Defendants took adverse actions against Conway in retaliation for his having engaged in protected speech and conduct, and in an effort to deter him and others from engaging in such protected speech and conduct in the future.

140.    Defendants' initial retaliatory acts were temporally proximate to the protected speech and conduct that prompted them. Defendants have continued to engage in similar and more severe retaliatory acts, also prompted by Conway's temporally proximate, protected speech and conduct, through the present time.

141.    The City and individual Defendants all had actual or constructive knowledge of the retaliatory acts and omissions in which the others had engaged, and yet each condoned, tolerated, encouraged, and/or failed to prevent or abate such acts and omissions and/or has responded to Conway's complaints so inadequately as to manifest indifference or unreasonableness under the circumstances.

142.    Defendants' retaliation included, but is not limited to, the acts described earlier in this Complaint, and continues to this day.

143.    The retaliation is and has been sufficiently severe to dissuade a reasonable Airport employee such as Conway, or any reasonable person, from raising or reporting safety concerns or engaging in other protected activity.

144.    Such adverse actions are and were motivated by Defendants' knowledge or belief that Conway had engaged, and continues to engage, in protected speech and/or conduct.

145.    The retaliatory actions are and were of such a magnitude, and occurred and continue to

occur with such regularity, as to deter a person of ordinary firmness from engaging in similar

protected speech or conduct.

146.    Defendants Simos and O'Donnell held such ranks and titles, or were otherwise

sufficiently empowered City officials, that their acts and omissions constitute the customs,

policies, and practices of the City.

147.    The City's customs, policies, and practices are also exemplified by other acts of

retaliation similar to those Conway has endured, including those directed at Laura Aye, a

diminutive, mild-mannered AOS I who, after suing Simos for sex discrimination, was falsely

accused by him of pressuring and intimidating Rossi Contractors to hire her son. They are also

exemplified by the retaliation experienced by Courtney Harris, a facilities manager who was

subjected to mistreatment so serious she was forced to transfer to O'Hare Airport after

complaining about a certain contractor who happened to be among Simos's and O'Donnell's

favorites.

148.    Conway complained about the retaliation to one or both individual Defendants, neither of

whom took any action to abate it, and each of whom—when they were not actually instigating

it—instead tolerated, ratified, encouraged, and/or exacerbated it. As such, these City officials

approved, endorsed, and adopted the custom, policy, and practice of retaliating against Conway

and others. The retaliation in this way became the City's custom, practice, and policy.

149.    As a direct and proximate result of this unlawful campaign of retaliation, which the City

endorsed and adopted as its own unwritten municipal policy, Conway has suffered and will

continue to suffer economic damages for which Defendants are liable, including but not limited

to loss of promotion and overtime opportunities, with their accompanying increases in salary,

wages, benefits, and other privileges of employment; as well as non-economic damages, including emotional distress, embarrassment, humiliation, and loss of personal and professional reputation.

150.     In acting as described in this Complaint, the individual Defendants intentionally, maliciously, wantonly, recklessly, and maliciously violated the First and Fourteenth Amendments of the United States Constitution, and thus are liable for punitive or exemplary damages and for such additional, substantial sanction as will deter them and other similarly situated officials from engaging in such behavior.

151.     In addition to Conway's economic and non-economic compensatory damages, Defendants are liable for Conway's attorneys' fees and costs, witness fees, expert fees, and any additional legal and/or equitable relief that this Court deems warranted and appropriate.

### CLAIM 2
### VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT, 740 ILCS/10, /15(b), /20, /20.1, AND /30 (AGAINST ALL DEFENDANTS, AND AGAINST BOTH INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL AND PERSONAL CAPACITIES)

152.     Conway incorporates all previous allegations.

153.     Each Defendant is an "employer," and Conway is an "employee," within the meaning of the Illinois Whistleblower Act, 740 ILCS 174/5.

154.     The Federal Aviation Administration and Chicago's Office of Inspector General are government and/or law-enforcement agencies within the meaning of the Illinois Whistleblower Act, 740 ILCS 174/15(b).

155.     When in September 2018 Conway reported, to the Federal Aviation Administration and Chicago's Office of Inspector General, that Defendant Simos had ordered him to falsify airfield conditions, Conway had reasonable cause to believe that he was disclosing, and in fact was disclosing, violations of state and/or federal laws, rules, and/or regulations.

156.    In stripping Conway of various job duties and responsibilities and of various security clearances and privileges, in ostracizing him, in denying him step and cost-of-living increases, in denying him various training, testing, promotion, and overtime opportunities, in imposing suspensions and other forms of discipline, and in otherwise behaving and conducting themselves as described in this Complaint, Defendants, in contravention of 740 ILCS 174/15(b), retaliated against Conway for disclosing violations, or what Conway reasonably believed to be violations, of state and/or federal laws, rules, and/or regulations.

157.    In refusing to falsify airfield conditions as ordered by Simos, Conway refused to participate in an activity that would result in violation of state and/or federal laws, rules, and/or regulations.

158.    In stripping Conway of various job duties and responsibilities and of various security clearances and privileges, in ostracizing him, in denying him step and cost-of-living increases, in denying him various training, testing, promotion, and overtime opportunities, in imposing suspensions and other forms of discipline, and in otherwise behaving and conducting themselves as described in this Complaint, Defendants, in contravention of 740 ILCS 174/20, retaliated against Conway for refusing to participate in an activity that would result in violation of state and/or federal laws, rules, and/or regulations.

159.    When in September 2018 Conway reported, to the Federal Aviation Administration and Chicago's Office of Inspector General, that Defendant Simos had ordered him to falsify airfield conditions, he was disclosing or attempting to disclose public corruption or wrongdoing.

160.    When they stripped Conway of various job duties and responsibilities and of various security clearances and privileges, ostracized him, denied him step and cost-of-living increases, denied him various training, testing, promotion, and overtime opportunities, imposed

suspensions and other forms of discipline, and otherwise behaved as described in this Complaint, both "within and without the workplace," and did so because Conway had disclosed or attempted to disclose public corruption or wrongdoing, Defendants, in contravention of 740 ILCS 174/20.1, acted in a manner materially adverse to Conway, who is and was a reasonable employee.

161.    As a direct and proximate result of Defendants' violations of 740 ILCS 174/15(b), 174/20, and 174/20.1, Conway has suffered and will continue to suffer economic and non-economic damages, including but not limited to loss of promotion opportunities, loss of overtime opportunities, and related economic benefits, as well as emotional distress, embarrassment, humiliation, and loss of personal and professional reputation.

162.    Conway is entitled, under 740 ILCS 174/30, to bring a civil action against Defendants to recover "all relief necessary to make [him] whole …" as a result of Defendants' violations of 740 ILCS 174/15(b), 174/20, and 174/20.1, including the foregoing damages, litigation costs, and attorneys' fees.

**PRAYER FOR RELIEF**

For the reasons stated above, Conway respectfully requests the following relief from the Court:

    A.    Declare that Defendants' acts and conduct constitute violations of the First and Fourteenth Amendments to the United States Constitution, as well as of 42 U.S.C. § 1983 and 740 ILCS 174/15(b), /20, and /20.1;

    B.    Declare that the City is vicariously liable, and/or is subject to *Monell* liability, for its management-level employees' acts described above based on the City's custom, policy, and practice of retaliating, permitting retaliation, endorsing retaliation, and/or failing to remedy retaliation against Conway and others;

    C.    Enter judgment in Conway's favor on all claims for relief;

D.      Enjoin Defendants from continuing to retaliate against Conway by encouraging, tolerating, and failing to abate the ongoing retaliation and by engaging in additional acts of retaliation;

E.      Declare that Defendants' acts and conduct constitute violations of the First and Fourteenth Amendments to the United States Constitution, as well as of 42 U.S.C. § 1983 and 740 ILCS 174/15(b), /20, and /20.1;

F.      Declare that the City is vicariously liable, and/or is subject to *Monell* liability, for its management-level employees' acts described above based on the City's custom, policy, and practice of retaliating, permitting retaliation, endorsing retaliation, and/or failing to remedy retaliation against Conway and others;

G.      Enter judgment in Conway's favor on all claims for relief;

H.      Enjoin Defendants from continuing to retaliate against Conway by encouraging, tolerating, and failing to abate the ongoing retaliation and by engaging in additional acts of retaliation;

I.      Award full compensatory economic and non-economic damages including, but not limited to, damages for mental anguish, emotional distress, humiliation, embarrassment, and loss of reputation that Conway has suffered and is reasonably certain to suffer in the future;

J.      Award punitive and exemplary damages for the individual Defendants' egregious, willful, and malicious conduct;

K.      Award pre- and post-judgment interest at the highest lawful rate;

L.      Award Conway his reasonable attorneys' fees (including expert fees) and all other costs of suit;

M.      Award all other relief in law or equity, including declaratory and injunctive relief, to which Conway is entitled and that the Court deems equitable, just, or proper.

## JURY DEMAND

Conway demands a trial by jury on all issues within this Complaint.

Respectfully submitted,

*/s/Donald Screen*                                                                                      

*/s/Jamie S. Franklin*

| | |
|---|---|
| Subodh Chandra (Ohio 0069233) | Jamie S. Franklin, ARDC No. 6242916 |
| Donald Screen (Ohio 0044070) | Assistant Clinical Professor of Law |
| THE CHANDRA LAW FIRM LLC | Employment and Civil Litigation Clinic |
| The Chandra Law Building | Chicago-Kent College of Law |
| 1265 W. 6th St., Suite 400 | 565 West Adams Street, Suite 600 |
| Cleveland, Ohio 44113 | Chicago, IL 60661 |
| 216.578.1700 Phone / 216.578.1800 Fax | 312.906.5048 Phone / 312.906.5299 Fax |
| Subodh.Chandra@ChandraLaw.com | jfranklin5@kentlaw.iit.edu |
| Donald.Screen@ChandraLaw.com | |

*Attorneys for Plaintiff Michael Conway*