## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL CONWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 4966 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| CITY OF CHICAGO, | ) | |
| COSTAS SIMOS, and | ) | |
| ERIN O'DONNELL-RUSSELL, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

While working as an airport operations supervisor at Chicago's Midway International Airport ("Midway") in 2018, Michael Conway reported a scheme by Midway's two highest-ranking officials, Costas Simos and Erin O'Donnell-Russell, to two outside agencies. According to Conway, Simos and O'Donnell ordered staff to falsify runway conditions for the benefit of a private airline. Conway's statements led to multiple investigations that eventually confirmed the existence of the scheme.

Here, Conway alleges that Simos and O'Donnell subjected him to pervasive and continuous retaliation for his reports to the agencies, asserting claims against them and the City of Chicago ("the City") (collectively, "Defendants") under 42 U.S.C. § 1983 and the First Amendment (Count I), as well as the Illinois Whistleblower Act ("IWA") (Count II). Defendants move to dismiss the claims under Federal Rule of Civil Procedure 12(b)(6). For the reasons given below, the City and O'Donnell's motion is granted in part and denied in part, and Simos's motion is denied.

## I.    **Background**[1]

Conway has worked for the City of Chicago Department of Aviation ("the Department"), since 1995. Among other responsibilities, the Department is in charge of operating Midway. Compl. ¶¶ 12, 18, ECF No. 1.

Since 1998, Conway has served as an Airport Operations Supervisor II ("AOS II"). As an AOS II, he monitored airfield and airside facilities to identify operational safety issues and ensured compliance with general safety and security standards pursuant to regulations administered by the Federal Aviation Administration ("FAA"). *Id.* ¶¶ 12, 18–19. To do so, Conway inspected runways, taxiways, ramps, and other such areas to ensure that they are free of safety hazards and in good physical condition; issued "Notices to Airman (NOTAMS)" to provide current information on aviation and airfield conditions, including the opening and closing of runways to FAA air traffic control; checked weather service reports, surface conditions, and temperatures; and advised pertinent city and aviation personnel of weather conditions. *Id.* ¶ 20.

Simos served as the Department's Deputy Commissioner until his retirement in April 2020, making him the "No. 2 official at Midway Airport." *Id.* ¶ 15. Above Simos was O'Donnell, Midway's Managing Deputy Commissioner; she retired in July 2019. *Id.* ¶ 16.

---

[1]     The following well-pleaded factual allegations are accepted as true for purposes of the motion to dismiss.

The incidents at issue in this action began on February 17, 2018. Between 10:00 and 11:30 a.m. that day, Conway observed Southwest Airlines ("Southwest") personnel heavily de-icing a taxiway at various gate positions. *Id.* ¶ 24.

As the duty supervisor, Conway received a call from Simos inquiring about the condition of the runways (Runway 22L was in use at the time). *Id.* ¶¶ 24–25. Conway advised Simos that the airfield was "Clear/Wet." *Id.* ¶ 25. Simos told Conway to change the condition on the FAA's Digital NOTAM system to "Clear/Dry." *Id.* ¶ 26. Conway explained that an AOS I had observed the airfield and determined it to be wet just thirty minutes earlier, but Simos said he "didn't care" and demanded that Conway declare the airfield dry. *Id.* ¶¶ 26–27. Simos indicated that the directive had come from O'Donnell and emphasized that "Southwest needs our help!" In fact, according to Conway, the directive from O'Donnell came at the behest of Southwest, which had a financial incentive to circumvent regulations that prohibited heavily laden aircraft from landing in wet conditions. *Id.* ¶ 2.

After hanging up with Simos, Conway asked an AOS I to recheck the runway conditions, but they remained Clear/Wet. *Id.* ¶ 29. Conway then drove to the airfield to inspect the surface conditions himself; he conducted a series of vehicle action braking tests, which confirmed that the entire airfield was wet, and even very slick from the de-icing compound in some locations. *Id.* ¶ 30.

When Conway returned inside, Simos called again to ask whether Conway had changed the condition on the NOTAM system. *Id.* ¶ 32. Uncertain of how to proceed, Conway asked two managers, including his supervising manager, Dave Kaufman,

3

about what Simos was demanding him to do. *Id.* ¶¶ 33–34. Both managers advised Conway to obey his superior's directive or risk being terminated for insubordination. *Id.* ¶¶ 33–34. Reluctantly yielding to the pressure, Conway ultimately reported the field condition as Clear/Dry. *Id.* ¶¶ 35–36.

Later in the week, Conway asked Simos about the events of February 17, which had become the subject of much discussion among Conway's managers. *Id.* ¶¶ 37, 40. Not in the mood to answer questions, Simos replied that he was "the fucking deputy commissioner" and that Conway would "do what [he was] told and not ask fucking questions[.]" *Id.* ¶ 40. After Kaufman stepped in to defuse the situation, Conway approached Simos again to express his concern that an aircraft could have slid off the runway and to say that he would never again comply with such a directive, which he found contrary to FAA regulations. *Id.* ¶¶ 41–42. Simos said he understood and that he would not put Conway in that situation again. *Id.* ¶ 43.

Nonetheless, Simos continued into early March 2018 to order other operations personnel to falsify runway conditions by changing them from Clear/Wet to Clear/Dry on the NOTAM system. *Id.* ¶ 44. During this time, Conway and his colleagues received numerous queries from Air Traffic Control personnel about whether the airfield was wet or dry. *Id.* ¶ 45.

In mid-March 2018, for instance, Conway fielded a call from Midway's Air Traffic Control tower informing him that Southwest pilots had been calling to report the airfield as Clear/Dry, even though the caller and others in the tower, as well as other operations personnel, could see that it was still wet. Given these circumstances,

Conway suggested to Kaufman and another manager that Conway take Southwest's chief pilot out on the airfield and show him the conditions that his pilots were insisting be reported as Clear/Dry, to which they agreed. *Id.* ¶ 45.

Shortly thereafter, Conway took Southwest's Assistant Chief Pilot, Colin Scantlebury, out onto the airfield. *Id.* ¶ 48. Scantlebury said that Conway was "300% correct" that the airfield was wet with de-icing compound and that he would raise the issue with O'Donnell and Southwest's Chief Pilot. *Id.* ¶ 49.

On March 20, 2018, Kaufman called Conway into his office to give him a verbal reprimand in front of another AOS II for "Conduct Unbecoming a City Employee." Specifically, Kaufman accused Conway of "making derogatory statements to a Southwest pilot" about the performance of his coworkers. *Id.* ¶ 50. Conway pushed back on this accusation, but to no avail. *Id.* ¶ 51.

Later in the day, however, Kaufman confessed to Conway that Conway had done nothing to warrant a reprimand, adding that Simos was the one who had ordered Kaufman to punish Conway for raising the issue with a pilot. *Id.* ¶ 52. Kaufman said that his hands were tied and encouraged Conway to accept the verbal reprimand, which would be removed from Conway's file in eighteen months, and let Simos settle down. *Id.* ¶ 53.

A few hours later, Kaufman called Conway into his office again and ordered him not to discuss the subject with any of his coworkers, explaining that it was bad for morale and that Simos had instructed him to pass along this order, too. *Id.* ¶ 54.

5

Another manager in the room warned Conway that the issue was "much bigger than [he] could ever imagine." *Id.* ¶ 55.

This practice of falsifying NOTAM reports continued. And Simos proceeded to demand that operations personnel falsify airfield conditions throughout the spring and summer of 2018. *Id.* ¶ 57.

In July 2018, Simos and O'Donnell began excluding Conway from meetings, trainings, and most other activities in which he used to participate as part of his job responsibilities. *Id.* ¶ 59. Only when Simos was on vacation did Kaufman permit Conway to participate in his essential activities. *Id.* ¶ 60.

On September 4, 2018, the day Simos was due to return from a vacation, Conway inadvertently crossed a runway that was not in use. *Id.* ¶ 61. As a result, Kaufman made him retake his written and driving tests to retain his airfield badge, which Conway did obtaining perfect scores. *Id.* ¶ 62.

After Conway returned from three weeks of leave at the request of his doctor, Kaufman informed him that, under a supposed "new policy," Conway might also be subject to suspension for crossing the runway. This was an unprecedented measure for such a minor infraction. *Id.* ¶¶ 63, 65. Earlier that summer, for instance, another employee had crossed an active runway, in front of an aircraft that had just landed, and received no punishment. *Id.* ¶ 64. Nonetheless, Simos and O'Donnell handed down a five-day suspension on October 16, 2018, which Conway began to serve on November 17. *Id.* ¶ 65. Around the same time, Conway learned from certain co-

6

workers that Simos had asked them to prepare "denigrating statements" about Conway" and grew angry when they expressed reluctance. *Id.* ¶ 66.

Soon after Conway returned from medical leave, in September 2018, he spoke with the Department's Personnel Director, Argentene Hrysikos, describing to her the troublesome conduct he had been observing from Simos and O'Donnell, as well as the retaliation he has been suffering at their hands. *Id.* ¶ 68. Hrysikos instructed him to report his concerns to "whatever agency [was] responsible for airport safety" and the City's Office of the Inspector General ("OIG"). *Id.* ¶ 69. Conway contacted both agencies, and each opened an investigation into his allegations. *Id.* ¶¶ 70–71.

The FAA issued a formal report on November 24, 2019, confirming much of Conway's story, including that airport management had "likely" directed staff to falsify airfield conditions on February 17, 2018, and that many employees felt compelled to comply with the orders for fear of retaliation. *Id.* ¶¶ 119–32.

The OIG published its own report on July 16, 2020, making similar findings. *Id.* ¶¶ 113–18. In addition, the OIG called out Simos by title for "order[ing] a change to the reported airfield conditions . . . from 'wet' to 'dry,' following a call from a private airline requesting that the airfield conditions be changed due to financial motivation." *Id.* ¶ 114. For this, the OIG recommended that Simos be terminated, which prompted his resignation. *Id.* ¶¶ 117–118.

In October 2018, Midway launched an investigation to identify the person who had reported the misdeeds to the FAA and the OIG, and the City and its attorneys planned to interrogate employees one-by-one. *Id.* ¶ 73. Conway was the first one to

be interviewed, and he readily acknowledged that he was the one who had blown the whistle. *Id.* ¶ 74.

During the next two months, Simos instructed staff to spy on Conway during his airfield inspections. *Id.* ¶ 75. Simos and O'Donnell also asked Kaufman and other operations supervisors to report every conversation they had with Conway. *Id.* ¶ 76. And Simos took every opportunity to degrade and humiliate Conway, including by yelling at him in front of his peers. *Id.* ¶ 78. One of the managers told Conway "the plan" was to make him look crazy and incompetent. *Id.* ¶ 81.

In December 2018, O'Donnell falsely accused Conway of being a liar in front of Kaufman and another manger and told him that she was having his "red stripe" removed from his badge. *Id.* ¶¶ 82–83. This meant that Conway could no longer drive on runways or taxiways without an escort. *Id.* ¶ 83. To Conway's knowledge, this was the first time in his twenty-three years of service at Midway that an AOS had been stripped of his or her red stripe. *Id.* ¶ 84.

Around the same time, O'Donnell began to adjust employees' schedules so that Conway was never the senior person on duty, instructing Kaufman and another manager to "make sure this happens." *Id.* ¶ 85. Shortly after that, Conway was forbidden from working in the office and relegated to trivial tasks like checking fuel trucks and watching the terminal ramp. *Id.* ¶ 86.

Over the following months, O'Donnell gradually stripped Conway of all of his duties except the most menial among them, such as counting cars in the parking lot and checking bathrooms for toilet paper and paper towels. *Id.* ¶ 88. On January 1,

2019, a manger informed Conway that his new assignment, effective immediately, was to check parking lots and garages. *Id.* ¶ 89. He was soon removed from the staff's overtime rotation as well, supposedly because he lacked a red stripe on his badge, even though other personnel without a red strip received overtime. *Id.* ¶ 91.

In February 2019, O'Donnell wrote up a false disciplinary notice claiming that Conway had improperly driven on the airfield. *Id.* ¶¶ 94–95. Conway received another trumped-up disciplinary notice on March 15, and again July 19, 2019, each concerning a report of an airfield inspection he had performed on December 4, 2018, in which he had concluded—properly, in his view—that the airfield was wet. *Id.* ¶¶ 97, 100. Conway ultimately received a fifteen-day suspension for the incident, which he served from July 30 to August 13, 2019. *Id.* ¶ 101.

Conway continued to experience retaliation throughout 2019 and into 2020. *Id.* ¶ 102. To name a few such instances:

- His airfield privileges were further diminished in June 2019, *id.*;

- O'Donnell excluded him from a co-worker's retirement party on July 30, 2019, *id.*;

- Simos forbade Kaufman from having any more contact with Conway at a meeting on September 11, 2019, *id.* ¶ 103;

- On September 22, 2019, he learned that Simos had unilaterally (and without notice) reversed certain routine raises to which Conway was entitled, *id.* ¶¶ 104–05;

- His application for a promotion to Assistant Chief Operations

9

Supervisor was inexplicably rejected in November 2019, *id.* ¶ 109.

- He was assessed a "special" bonus tax of 45% on the reimbursement of his missing raises in January 2020, *id.* ¶ 107;

- As late as March 13, 2020, he continued to be tailed at Simos's behest while performing parking lot "inspections," *id.* ¶ 111.

Conway filed this action on August 24, 2020, bringing two counts. Count I alleges retaliation in violation of the First Amendment, as incorporated under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983. *Id.* ¶¶ 133–51. Count II alleges violations of the IWA, 740 Ill. Comp. Stat. 174/5 *et seq.* *Id.* ¶¶ 152–62.

Defendants have moved to dismiss the complaint under Rule 12(b)(6). *See* Defs. City and O'Donnell's Mot. Dismiss, ECF No. 30; Def. Simos's Mot. Dismiss, ECF No. 32. Because there is substantial overlap between the motions, the Court addresses them in tandem.

## II.   Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up).

10

When considering a motion to dismiss, courts accept "all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). At the same time, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Iqbal*, 556 U.S. at 678.

### III.   Analysis

Defendants move to dismiss the complaint on various grounds. The Court will address each count, and each argument, in turn.

### A.   First Amendment Retaliation (Count I)

As to Count I, Defendants initially contend that Conway fails to allege all the elements of a First Amendment retaliation claim. The City also argues that Conway fails to adequately allege municipal liability under § 1983.

### 1.   Whether Conway has stated a First Amendment claim

To prevail on a claim for retaliation in violation of the First Amendment, a public employee must show that: (1) his speech was constitutionally protected, (2) he suffered a deprivation likely to deter speech, and (3) his speech was at least a motivating factor in the employer's action. *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013). Defendants challenge all three elements.

11

### a) Constitutionally protected speech

"For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing the speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Id.* (cleaned up). Here, Defendants challenge Conway's ability to satisfy the first of these sub-elements. In Conway's view, he spoke as a private citizen both by initially refusing to Simos's February 17, 2018, order to falsify the conditions of the airfield, and by reporting the ongoing falsification to the FAA and the OIG several months later. *See* Compl. ¶ 137.

The Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), "supplies the test for distinguishing employee and citizen speech." *Lett v. City of Chi.*, 946 F.3d 398, 400 (7th Cir. 2020). Recognizing that those who enter government service "by necessity must accept certain limitations on his or her freedom," *Garcetti* held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 418, 421. Thus, the standard articulated by *Garcetti* "is whether the employee makes the relevant speech 'pursuant to [his] official duties.'" *Lett*, 946 F.3d at 400 (quoting *Garcetti*, 547 U.S. at 421). An employee's official duties "include both formal job requirements and the employer's real rules and expectations." *Davis v. City of Chi.*, 889 F.3d 842, 845 (7th Cir. 2018).

12

As the Supreme Court later clarified in *Lane v. Franks*, however, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." 573 U.S. 228, 239 (2014); *see also Chrzanowski v. Bianchi*, 725 F.3d 734, 738 (7th Cir. 2013) ("[S]peech does not owe its existence to a public employee's professional responsibilities within the meaning of *Garcetti* simply because public employment provides a factual predicate for the expressive activity[.]" (cleaned up)). Thus, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240.

Defendants analogize this case to *Davis* and *Lett*, in each of which the Seventh Circuit addressed an employee's refusal to revise a report as directed by a superior. *See Davis*, 889 F.3d at 844–45 (Davis "refused to change his findings" of police misconduct); *Lett*, 946 F.3d at 401 (Lett "refus[ed] to alter an investigative report that he was assigned to prepare"). In these cases, the Seventh Circuit held that the employees were acting within the scope of their employment and not as private citizens because, as part of their employment, they were "responsible for revising [their] reports at the direction of [their] superiors." *Davis*, 889 F.3d at 845; *see also Lett*, 946 F.3d at 401. By contrast, Conway alleges that the FAA places the responsibility of reporting airfield conditions on operations specialists like himself, rather than supervisors, like Simos. *See* Compl. ¶ 130. Consequently, he argues, his initial refusal to obey Simos's directive to enter false information into NOTAM was

13

outside the scope of his duties. While discovery may not bear this out, at the pleading stage Conway is entitled to the benefit of all reasonable inferences.

In addition, it is plain that Conway's subsequent reports to the FAA and the OIG constituted speech as a private citizen. Of course, "if a public employee reports official misconduct in the manner directed by official policy, to a supervisor, or to an external body with formal oversight responsibility, then the employee speaks pursuant to her official duties and her speech is unprotected by the First Amendment." *Spalding v. City of Chi.*, 186 F. Supp. 3d 884, 904 (N.D. Ill. 2016). "By contrast, if an employee . . . reports misconduct outside established channels or in violation of official policy, she speaks as a private citizen and her speech is constitutionally protected." *Id.* at 904–05 (citing *Chrzanowski*, 725 F.3d at 739–40; *Chaklos v. Stevens*, 560 F.3d 705, 709–12 (7th Cir. 2009); *Houskins v. Sheahan*, 549 F.3d 480, 491 (7th Cir. 2008)); *see also Lane*, 573 U.S. at 238–39.

Like the plaintiffs in *Spalding*, Conway's alleged reports of his superiors' misconduct—made to "outside," investigative agencies, "on [his] own initiative," and presumably "on [his] own time"—occurred outside of established channels. *See* 186 F. Supp. 3d at 905. Indeed, the complaint makes clear that such whistle-blowing was not "ordinarily within the scope of [his] duties," but rather "merely concern[ed] those duties." *See Lane*, 573 U.S. at 240. In other words, his reports to these agencies were "not generated in the normal course of [his] duties," *Houskins*, 549 F.3d at 491, nor among "the tasks he was paid to perform," *Garcetti*, 547 U.S. at 422.

14

For their part, Defendants note that it was Midway Personnel Director, Hrysikos, who allegedly suggested that Conway report his concerns to the OIG and "whatever agency is responsible for airport safety." Compl. ¶ 69. But, this alone is insufficient to establish as a matter of law that Conway was following an official policy or mechanism by which to raise his complaints. In fact, as alleged in the complaint, Hrysikos was uncertain as to which particular agency could even address this matter. Again, at this nascent stage, this is sufficient to allege that there was no official policy or channel by which Conway could raise his concerns.

Defendants' remaining cases are similarly unpersuasive. In *Milsap v. City of Chicago*, the speech was unprotected because "the OIG was already acting as a formal oversight body," and "already investigating the City department," when the plaintiff made his report to it. No. 16 C 4202, 2018 WL 3361889, at *4 (N.D. Ill. July 10, 2018). Conway, however, alleges no such formal oversight relationship, whether as to the OIG or the FAA. And he asserts that neither agency knew of the misconduct before his reports. As for *Kubiak v. City of Chicago*, the problem there was that the employee's speech "was directed to her supervisor, the director of her office, and the [internal affairs division]." 810 F.3d 476, 482 (7th Cir. 2016). By contrast, Conway alleges that he had "to go outside" such internal channels in order to pursue his concerns with Midway's highest-ranking officials. *See Spalding*, 186 F. Supp. 3d at 906 (distinguishing *Kubiak*).

15

Accordingly, the Court concludes that the complaint adequately alleges that Conway engaged in protected private speech when he reported the alleged scheme to the OIG and the FAA.

### b) Deprivation likely to deter speech

To state a First Amendment retaliation claim, Conway also must allege that he suffered a deprivation likely to deter speech. To satisfy this element, "the action of which the employee is complaining" need only "be sufficiently 'adverse' to deter the exercise of [First Amendment] rights." *Power v. Summers*, 226 F.3d 815, 820–21 (7th Cir. 2000). "Any deprivation under color of law that is likely to deter the exercise of free speech . . . is actionable" under this standard, "even something as trivial as making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday." *Id.* at 820; *see also Smith v. Fruin*, 28 F.3d 646, 649 n.3 (7th Cir. 1994) ("[E]ven minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures.").

The complaint satisfies this low bar. First, Conway alleges that he has been stripped of nearly all essential responsibilities for the position he has held for over twenty years and relegated to such minor tasks as inspecting parked cars. *Cf. Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004) (noting that a "transfer to a . . . less skilled post" can suffice to deter free speech); *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002) (stating that "significantly diminished material responsibilities" satisfy even the more demanding materiality standard of Title VII). Furthermore, according to

Conway, O'Donnell and Simos subjected him to a campaign of harassment and ostracization. *Cf. Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989) (holding that "a campaign of petty harassments . . . violates the First Amendment"). Moreover, Conway received repeated discipline for baseless charges. *Cf. Glass v. Dachel,* 2 F.3d 733, 741 (7th Cir. 1993) (noting that "a reprimand letter" can "rise to the level of constitutional significance"). He also was denied routine raises and taxed excessively once they were reimbursed. *Cf. Powers*, 226 F.3d at 821 (reasoning that the denial of "a catch-up raise" is a sufficient deprivation). Such deprivations are most than sufficient, and Simos's views to the contrary are meritless.[2]

### c) **Motivating factor**

Finally, Conway must allege that his speech was at least a motivating factor in the foregoing actions, meaning that the allegations must support "a causal link" (but not necessarily a but-for link) between the two. *See Spiegla*, 371 F.3d at 940– 42. Such a link may be established by direct or circumstantial evidence, including "suspicious timing." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012); *cf. Bernero v. Vill. of River Grove*, No. 17 C 5297, 2018 WL 3093337, at *5 (N.D. Ill. June

---

[2]    On that note, the Court rejects Simos's argument that Conway has not shown him to have been personally involved in the alleged retaliation. As detailed above, the complaint easily satisfies this "prerequisite for individual liability in a § 1983 action." *See Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997). Incidentally, the Court also denies Simos's request for qualified immunity on Count I at this time. Qualified immunity "is an affirmative defense," *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982), and "a plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses," *Independent Trust Corp. v. Stewart Info Services Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). In any event, taking Conway's allegations to be true, the complaint establishes that Simos's alleged retaliatory conduct violated "clearly established" First Amendment rights "of which a reasonable person would have known." *See Harlow*, 457 U.S. at 818.

22, 2018) (noting that district courts "have looked to [*Kidwell*] for guidance at the pleading stage").

The complaint satisfies this requirement as well. For one thing, Conway alleges that Simos explicitly rebuked him for initially defying Simos's February 17, 2018, order to falsify the runway conditions, including by fuming at him, "What is your fucking problem with Clear and Dry?!" Compl. ¶ 38. For another, Conway alleges that Simos and O'Donnell began to retaliate against him just a few months later and ramped up their retaliation as soon as Conway confessed to blowing the whistle on them to the FAA and the OIG. *See id.* ¶¶ 59, 73–86; *cf. Kidwell*, 679 F.3d at 966 ("[F]or a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that an adverse employment action follows close on the heels of protected expression, and . . . the person who decided to impose the adverse action knew of the protected conduct." (cleaned up)). Thus, the complaint more than plausibly draws the requisite link between Conway's protected speech and the adversity he experienced.

Simos's counterarguments are unpersuasive. Although he insists that Conway did not engage in any protected speech until his reports to the FAA and the OIG, the Court has already rejected this view above. And even assuming for the sake of argument that Simos were correct, he fails to explain why the alleged retaliation occurring after Conway reported his misconduct to these outside agencies was not motivated by that protected speech. To this point, Simos misreads the complaint in contending that two months passed between Conway's admission that he blew the

whistle and the onset (or continuation) of the retaliatory conduct. At any rate, even a two-month interval would not be enough to defeat a plausible inference of causation at the pleading stage, where all inferences are drawn in Conway's favor. *See Bernero*, 2018 WL3093337 at *5.

**2.    Whether Conway Has Adequately Alleged Municipal Liability**

The City next contends that Conway has not sufficiently alleged municipal liability under § 1983 and *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). To establish municipal liability under *Monell*, "a plaintiff must show the existence of an official policy . . . that . . . is the moving force behind the deprivation of constitutional rights." *Teesdale v. City of Chi.*, 690 F.3d 829, 833–834 (7th Cir. 2012) (cleaned up). "A plaintiff can establish on official policy through (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* at 834 (cleaned up).

Conway proceeds under the second and third theories, positing that Simos and O'Donnell each had engaged in a widespread custom of retaliation against him and possessed final policymaking authority. The City responds to the first point by contending that "three separate and isolated incidents of retaliation does [*sic*] not amount to a 'widespread practice.'" Def. City & O'Donnell's Reply Supp. Mot. Dismiss at 8, ECF No. 46 (citing *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (stating that "there is no clear consensus as to how frequently" conduct

must occur to constitute a widespread custom or practice, "except that it must be more than one instance, or even three" (cleaned up))). But Conway has alleged "not just a few, but dozens of instances" of retaliation by Midway's two highest-ranking officials "occurring constantly over course of several years." *See Mundo v. City of Chi.*, No. 20 C 2562, 2021 WL 3367160, at *4 (N.D. Ill. Aug. 3, 2021) (Lee, J.). Moreover, as this Court explained in *Mundo*, a plaintiff need not identify "even one other individual" who has been affected by the alleged custom or practice, *White v. City of Chi.*, 829 F.3d 837, 844 (7th Cir. 2016), so long as he or she presents a series of bad acts from which a trier-of-fact can "infer from them that the policymaking level of government was bound to have noticed what was going on," *Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995). Like the plaintiff in *Mundo*, Conway satisfies that pleading burden here.

As to the latter point, the Seventh Circuit has explained that "[o]fficials with final decisionmaking authority are deemed policymakers for *Monell* purposes." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 676 (7th Cir. 2009). "Helpful in determining whether an official is a final decisionmaker is an inquiry into: (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Id.* (cleaned up). "Also helpful is an examination of not only positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law." *Id.* (cleaned up).

20

The inquiry "is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker in a particular area, or on a particular issue. *Id.* (cleaned up).

Here, the complaint illustrates numerous instances in which Simos and O'Donnell—Midway's chief officials—exercised the final say on disciplinary, and even policy, matters at the airport. *See, e.g.*, Compl. ¶ 63 (it was "up to Simos to decide" whether Conway would be suspended for crossing a runway "under a new policy"); *id.* ¶¶ 83–84 (O'Donnell unilaterally removed Conway's red stripe, a move without precedent in his twenty-three years of service); *id.* ¶ 105 (Simos unilaterally reversed Conway's routine raises, "a personnel action that is almost never taken"). Indeed, according to Conway, O'Donnell went so far as to boast "that she was responsible for imposing these disagreeable measures on him." *Id.* ¶ 86.

The City retorts that Simos and O'Donnell could not be final decisionmakers because "[t]he City Council has expressly delegated authority to the Commissioner of Human Resources to promulgate personnel rules." Def. City & O'Donnell's Mem. Supp. Mot. Dismiss at 11, ECF No. 31 (citing M.C.C. § 2-74-050). By its own terms, however, § 2-74-050 delegates that authority only with respect disciplinary measures "such as suspension, demotion in rank or grade, or discharge," not measures like the sort at issue here. M.C.C. § 2-74-050(12). Moreover, the ordinance contemplates a role "for the department head or designee responsible for making the decision." *Id.* Thus, the City's reliance on this ordinance alone, especially when viewed in light of Conway's contrary allegations, is insufficient to warrant a dismissal at this stage.

To sum up, Conway has adequately alleged the elements of a First Amendment retaliation claim, as well as municipal liability under *Monell*. Defendants' motions to dismiss Count I are thus denied.

## B.   Violations of the IWA (Count II)

In Count II, Conway alleges violations of three provisions of the IWA: 740 Ill. Comp. Stat. 174/15(b), 174/20, and 174/20.1. *See* Compl. ¶ 161. Defendants raise three arguments for dismissing this claim in full, including two under Illinois' Local Governmental and Governmental Employees Tort Immunity Act ("ITIA"). *See* 745 Ill. Comp. Stat. Ann. 10/1-101 *et seq*. First, they contend that the claim is barred by the ITIA's one-year statute of limitations. Second, they assert that the ITIA grants them immunity from the claim. And third, Simos and O'Donnell insist that the IWA does not provide for individual liability.[3]

---

[3]      The City and O'Donnell also argue that Conway has not stated a claim under Section 20 of the ITIA because, after initially refusing Simos's order to falsify the runway conditions, he "ultimately relented and reported the field condition as Clear/Dry." Compl. ¶ 36. Defendants are correct that, in order to bring a ITIA claim, the employee must have "refus[ed] to participate" in an activity that would result in a violation of a State or federal law, rule, or regulation. 740 Ill. Comp. Stat. 174/20. But the Court finds that Conway has alleged such a refusal, not only insofar as he initially refused Simos's order, but also insofar as he later restated his rejection of such instructions and refused to participate further. Defendants' reliance on *Collins* is misplaced because the plaintiff there merely "questioned" and "complained" about his superiors' decision. 997 N.E.2d at 828. That is not the case here.

For his part, Simos posits that Conway has not stated a claim under Section 20.1 because he has not alleged a retaliatory act that "would be materially adverse to a reasonable employee." *See* 740 Ill. Comp. Stat. Ann. 174/20.1. This material adversity standard mirrors those under federal anti-discrimination statutes like Title VII. *Harris v. City of Chi.*, No. 19 C 5878, 2020 WL 4815907 (N.D. Ill. Aug. 18, 2020). And Title VII's material adversity standard is satisfied by "significantly diminished material responsibilities." *Traylor*, 295 F.3d at 788. Because Conway has alleged that Simos significantly diminished his essential responsibilities, he has stated materially adverse action under Section 20.1.

### 1.     Whether Count II is Time-Barred

Defendants submit that Count II is time-barred.  Section 8-101(a) of the ITIA provides that no civil action "may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued."  745 Ill. Comp. Stat. 10/8-101(a).  Because the statute of limitations is an affirmative defense, however, it forms a basis for dismissal under Rule 12(b)(6) only when the complaint affirmatively "sets out all the elements" of the defense.  *Indep. Tr. Corp.*, 665 F.3d at 935.

Conway does not dispute that Section 8-101(a) governs the timeliness of his IWA claim, but attempts to save it by invoking the continuing violation doctrine.  This doctrine applies where the alleged violation "involves continuous or repeated injurious behavior, by the same actor and of a similar nature." *Spalding*, 186 F. Supp. 3d at 919 (quoting *Taylor v. Bd. of Educ. of Chi.*, 10 N.E.3d 383, 395 (Ill. App. Ct. 2014)).  In such a case, the cause of action "does not accrue until the date the final injury occurs or the tortuous acts cease." *Id.*

Here, Conway's allegations are sufficient to trigger the continuing violation doctrine.  If Conway is right, Simos and O'Donnell each directed a series of retaliatory acts, occurring with some frequency, over an extended period of time.  The problem for Conway is that O'Donnell's actions necessarily ended when she retired in July 2019, more than a year before the complaint was filed.  *See* Compl. ¶ 16.  And she cannot be held responsible for Simos's actions after her retirement. *See Mnyofu v.*

23

*Bd. of Educ. of Rich Twp. High Sch. Dist. 227*, No. 03 C 8717, 2007 WL 1308523, at *15 (N.D. Ill. Apr. 27, 2007) (stating that individuals cannot be "lump[ed]" together or otherwise treated collectively under the IWA, even if they work for the same employer). Accordingly, the ITIA claim is dismissed with prejudice as untimely with respect to O'Donnell. *See*

Simos, on the other hand, allegedly engaged in retaliatory actions well into the one-year period preceding the filing of Conway's complaint. *See id.* ¶¶ 103–12. Therefore, his (and the City's) motion to dismiss the ITIA on statute of limitation grounds is denied.[4]

### 2.     Whether Defendants Are Immune from Count II

Defendants also argue that they are immune from Conway's IWA claim under Section 2-201 of the ITIA, which provides that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 Ill. Comp. Stat. 10/2-201. Like the statute of limitations, Section 2-201 immunity is an affirmative defense that a plaintiff need only avoid pleading into, not plead around. *Van Meter v. Darien Park Dist.*, 799 N.E.2d 273, 285 (Ill. 2003).

The Illinois Supreme Court has drawn a distinction "between situations involving the making of a policy choice and the exercise of discretion." *Id.* "Municipal defendants are required to establish both of these elements in order to invoke

---

[4]     Although the City and Simos submitted separate papers, the City does not contend that it cannot be held vicariously liable under Count II for Simos's alleged conduct.

immunity under [S]ection 2-201." *Id.*; *see also Valentino*, 575 F.3d at 679 ("Section 2-201 immunizes an individual defendant only to the extent that the action he is being sued for involves both the making of a policy choice and the exercise of discretion"). The Illinois Supreme Court has characterized the "policy" element as consisting of "decisions requiring a governmental entity to balance competing interest and to make a judgement call as to what solution will best serve those interests." *Van Meter*, 799 N.E.2d at 286; *cf. Valentino*, 575 F.3d at 679 (noting that "because the [ITIA] is in derogation of the common law, it must be construed strictly against the public entities involved" (cleaned up)).

In *Valentino*, the Seventh Circuit signaled that retaliatory acts are a poor fit for the "policy" prong of Section 2-201 immunity. There, the plaintiff had been fired for making copies of payroll records to support her suspicion of misconduct. 575 F.3d at 668–669. In denying immunity to the defendant, the court noted that the decision to fire an employee out of retaliation "does not amount to a 'judgment call between competing interests.'" *Id.* at 679 (implicitly quoting *Van Meter*, 799 N.E.2d at 286). "In fact," the court was "at a loss to identify any competing interests at all." *Id.*; *see also Spalding*, 186 F. Supp. 3d at 919 ("such retaliation cannot be characterized as a . . . 'judgment call between interests'" (quoting *Valentino*, 575 F.3d at 679). Similarly, here, Defendants fail to identify any competing interests that had to be balanced when undertaking the alleged acts of retaliation. Accordingly, Defendants' request that the Court immunize them from Count II under Section 2-201 is denied at this juncture.

### 3.    Whether Simos May Be Individually Liable

Finally, Simos (as well as O'Donnell) argues that there is no individual liability under the IWA.  But, as this Court has previously explained, that view conflicts with "[t]he unambiguous and plain language of the IWA."  *Van Pelt v. Bona-Dent, Inc.*, No. 17 C 1128, 2018 WL 2238788, at *6 (N.D. Ill. May 16, 2018) (Lee, J.).  As amended in 2008, the statute defines an "employer" against whom the plaintiff has a cause of action to include not only the "entity" itself, but also "any person acting within the scope of his or her authority express or implied on behalf of those entities."  740 Ill. Comp. Stat. 174/5.  As Simos concedes, the weight of authority in this district agrees that this language imposes individual liability.  *See Wheeler v. Piazza*, 364 F. Supp. 3d 870, 884 (N.D. Ill. 2019) (discussing the "split" and adopting the majority approach).  And the Court continues to find the minority view unpersuasive because it does not effectuate the statute's unambiguous language.  *See, e.g.*, *Parker v. Ill. Hum. Rts. Comm'n*, No. 12 C 8275, 2013 WL 5799125, at *9 (N.D. Ill. Oct. 25, 2013) (reading "any person" to mean only "agents"); *cf. People v. Christopherson*, 899 N.E.2d 257, 260 (Ill. 2008) ("When the statutory language is clear and unambiguous, it must be given effect without resort to other tools of interpretation.").

IV.    Conclusion

For the reasons given above, the City and O'Donnell's motion to dismiss is granted in part and denied in part, and Simos's motion to dismiss is denied.  Count II is dismissed with prejudice with respect to O'Donnell.  In all other respects, the motions are denied.


IT IS SO ORDERED.          ENTERED: 9/16/21

_____
**John Z. Lee**
**United States District Judge**