# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MICHAEL CONWAY,
Plaintiff

v.

CITY OF CHICAGO, *et al.*
Defendants

No. 20 CV 4966

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Conway filed this action alleging federal and state law claims of protected-speech retaliation under the First Amendment by Defendants City of Chicago (the "City"), the City's Department of Aviation ("CDA") Managing Deputy Commissioner Erin O'Donnell,[1] and CDA Deputy Commissioner Costas Simos. (R. 1 ("Compl.") ¶ 1.)[2] The defendants filed a motion for summary judgment under Federal Rule of Civil Procedure 56. (R. 252.) Conway has cross-moved for partial summary judgment on his federal claim. (R. 303; R. 324 ("Pl.'s Br.").) For the following reasons, the defendants motion is granted as to Conway's federal claim, and Conway's motion is denied in its entirety. The Court declines to exercise supplemental jurisdiction

---

[1] The Court adopts the defendants' preferred nomenclature for Erin O'Donnell-Russell. (*See* R. 355, Plaintiff's Response to Defendants' Statement of Facts ("Pl.'s Resp. to Defs.' SOF") ¶ 4.)

[2] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate. For documents filed under seal, the Court cites the sealed version of the documents while attempting not to reveal any information that could be reasonably deemed confidential. Confidential information is discussed to the extent necessary to explain the path of the Court's reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

under 28 U.S.C. § 1367 over Conway's state law claim, which is dismissed without prejudice. Conway's motion for oral argument is denied, (*see* Pl.'s Br. at ii), and his motion to seal (R. 349) is granted.

## BACKGROUND[3]

Conway has been employed by the CDA since December 1995. (Pl.'s Resp. to Defs.' SOF ¶ 2.) He was first hired as an Airport Operations Supervisor ("AOS") I and then promoted to the role of AOS II in about August 1999. (*Id.*) There is no dispute that Conway's duties at all times of his employment included monitoring and reporting the runway conditions at Midway Airport ("Midway") in Chicago, Illinois. (*Id.* ¶ 24; R. 351, Defendants' Response to Plaintiff's Statement of Facts ("Defs.' Resp. to Pl.'s SOF") ¶ 2.) This suit relates to Conway's performance of these duties on the morning of February 17, 2018, and alleged acts of retaliation by the defendants. (Defs.' Resp. to Pl.'s SOF ¶ 17; Pl.'s Resp. to Defs.' SOF ¶ 31.)

Conway claims that on February 17th, Simos ordered him to falsify a report about runway conditions. (Pl.'s Resp. to Defs.' SOF ¶ 31.) The parties disagree as to the proper characterization of the weather conditions that day. (*Compare* Defs.' Resp. to Pl.'s SOF ¶ 35, *with* Pl.'s Resp. to Defs.' SOF ¶¶ 39–42.) But they agree that Simos, on his authority as Deputy Commissioner, asked Conway to update the runway conditions and that Conway did not immediately do so. (*See* Defs.' Resp. to Pl.'s SOF ¶¶ 31–32.) The parties agree that Conway eventually issued a runway condition report consistent with Simos's desires. (*Id.* ¶ 37.)

---

[3] The following facts are taken from the parties' L.R. 56.1 Statements, the materials cited therein, and other aspects of the record in this case.

Seven months later, on September 4, 2018, Conway was involved in a "runway incursion," *i.e.*, "an unauthorized intrusion of a vehicle or aircraft onto an aircraft movement area." (Pl.'s Resp. to Defs.' SOF ¶¶ 54–55; Defs.' Resp. to Pl.'s SOF ¶ 70.) The parties dispute whether a runway incursion is a very serious and significant safety violation. (*Compare* Pl.'s Resp. to Defs.' SOF ¶¶ 74–75, *with* Defs.' Resp. to Pl.'s SOF ¶¶ 104–06.) There is evidence that runway incursions are expressly prohibited by the Federal Aviation Administration ("FAA"). (Defs.' Resp. to Pl.'s SOF ¶ 2.) There is also evidence that the FAA promptly began investigating the incident that same day. (Pl.'s Resp. to Defs.' SOF ¶ 55.) But Conway testified that similar conduct by others had never been disciplined at Midway. (Defs.' Resp. to Pl.'s SOF ¶¶ 104–06.)

On September 6, 2018, General Manager Samual David Kaufman told Conway that a pre-disciplinary meeting would be scheduled the following week to consider potential rule violations associated with his runway incursion. (Pl.'s Resp. to Defs.' SOF ¶¶ 18, 60.) At some point, Conway told Kaufman that he believed the incursion was caused partially from knowing that Simos "was returning from his vacation that day." (Defs.' Resp. to Pl.'s SOF ¶ 74.) When the incursion occurred, Conway was experiencing serious "stress and pressure" from "the various confrontational issues at work." (*Id.*) Specifically, due to the weather conditions that day, Conway was concerned that Simos would order him to falsify the runway conditions again. (R. 353-1 ("Conway Dep.") at 181:5–17, 394:14–396:6.)

Beginning on September 11, 2018, Conway took sick leave and the pre-disciplinary meeting was rescheduled. (Defs.' Resp. to Pl.'s SOF ¶ 75; Pl.'s Resp. to

3

Defs.' SOF ¶ 61.) Conway discussed his leave on or about September 17 or 20, 2018, with the Director of Administration for Human Resources. (Pl.'s Resp. to Defs.' SOF ¶ 62.) According to Conway, at this point, he informed the director of Simos' February 17th request to incorrectly update the airfield condition reports, and she advised him to report it to the FAA and the Office of the Inspector General ("OIG"). (*Id.*) Conway then filed complaints regarding the February 17th incident with the FAA on September 20th, the OIG on September 27th, and the Occupational Safety and Health Administration ("OSHA") on October 16th. (Defs.' Resp. to Pl.'s SOF ¶¶ 77, 84, 93; Pl.'s Resp. to Defs.' SOF ¶¶ 63, 67, 70.)

Conway received medical permission to return from leave without restrictions on October 2nd. (Pl.'s Resp. to Defs.' SOF ¶ 68; Defs.' Resp. to Pl.'s SOF ¶ 75.) Conway's pre-disciplinary hearing was held upon his return to work on October 9th. (Pl.'s Resp. to Defs.' SOF ¶ 77.) On October 16, 2018, one of the Airport Managers for Midway's Operations division handed Conway notice that he would be suspended for five-days for the September 4th incident. (*Id.*; Defs.' Resp. to Pl.'s SOF ¶ 105.)

Conway claims that his five-day punishment reflected a brand-new policy; previously, executive management had, before deciding on the appropriate discipline, considered the circumstances of an incursion. (Defs.' Resp. to Pl.'s SOF ¶ 104.) Others testified, though, that it was the CDA's routine practice to impose a minimum of a five-day suspension as a penalty for runway incursions. (*Compare* Pl.'s Resp. to Defs.' SOF ¶¶ 74–75, *with* Defs.' Resp. to Pl.'s SOF ¶ 106.) Conway filed the present action on August 24, 2020. (*See* Compl.)

4

## LEGAL STANDARD

"Summary judgment is proper if the defendants show that no material facts are genuinely disputed and that they are entitled to judgment as a matter of law." *Cage v. Harper*, 42 F.4th 734, 737 (7th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). Where, as here, the parties file cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 376 (7th Cir. 2009). "[T]he moving party may prevail 'by showing an absence of evidence to support' the nonmoving party's claims." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020)).

## ANALYSIS

### I. FIRST AMENDMENT RETALIATION[4]

Count I is asserted under 42 U.S.C. § 1983, which "creates a private right of action against any 'person' who violates the plaintiff's federal rights while acting under color of state law." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (quoting § 1983). "The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits a public employer from retaliating against an employee for engaging in protected speech." *Clarke*, 574 F.3d at 376. Conway alleges that the defendants violated his First and Fourteenth Amendment right to free speech by retaliating against him for reporting the misconduct of his supervisor. (Compl. ¶ 1.) The Court begins with Conway's claims against Simos and O'Donnell

---

[4] Jurisdiction over this federal claim is proper under 28 U.S.C. § 1331.

5

(the "Individual Defendants") before considering the City's potential liability under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978).

### A. The Individual Defendants

To prove his claim, Conway must show that: "(1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter him from exercising his First Amendment rights; and (3) his speech was a motivating factor in [the Individual Defendants'] adverse action[s] against him." *Cage*, 42 F.4th at 741. The Individual Defendants argue that they are entitled to summary judgment because no reasonable juror could find in Conway's favor as to any element. (R. 253 at 13.) Conway moves for summary judgment on only the first two elements, arguing that the third element must be presented to a jury. (*See* Pl.'s Br. at 4.) Before analyzing these elements, the Court addresses the preliminary issue of the proper temporal scope of these claims.

### 1. Time-Barred Conduct

The Individual Defendants argue that any claim arising from conduct occurring before August 24, 2018, is time-barred. (R. 252 at 19–20; R. 373 at 12–13.) In their view, this is because the applicable statute of limitation for bringing § 1983 claims is two years, *Brooks v. Ross*, 578 F.3d 574, 578–79 (7th Cir. 2009), and the complaint was filed on August 24, 2020. Conway, however, argues that the limitation period did not begin to run "until the date the final injury occur[ed] or the tortious acts cease[d]," invoking the continuing violation doctrine. (R. 358 at 10 (quoting *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 89 (2003)).) Conway asserts that, because the defendants' wrongful conduct lasted until August 2020, that is when the limitation period rightfully ended. (*Id.* at 9.) The Individual Defendants respond that all of the

alleged acts Conway relies upon were discrete, and thus do not constitute continuous violations. (R. 252 at 19–20; R. 373 at 13.)

Tolling doctrines like the continuous-violation doctrine "are to be applied sparingly." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). "Easy to identify" adverse employment actions like "termination, failure to promote, denial of transfer, or refusal to hire," do not warrant application of the continuing violation doctrine, as they are violations in and of themselves. *Id.* at 115. These "[d]iscrete acts stand in contrast to the situation that is usually known as a 'continuing violation' or . . . a 'cumulative violation.'" *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014). A hostile work environment, however, "encompasses a single unlawful employment practice," which "cannot be said to occur on any particular day" and is based on employer actions that "may not be actionable on [their] own," and thus, are properly subject to the continuous-violation rule. *Id.* at 116; *see also Bass*, 746 F.3d at 839 ("Cumulative violations arise when it is not immediately apparent that the law is being violated. . . . a plaintiff may delay suing 'until a series of wrongful acts blossoms into an injury on which suit can be brought.'") (citation omitted).

Here, the retaliatory actions Conway complains of include: "disciplinary actions, suspensions, removal from his job inspecting the airfield, reassignment, denial of a union-mandated step-increase in pay and related cost-of-living-adjustment benefits, promotion denial, and City-enforced isolation from his colleagues." (Pl.'s Br. at 1; *see also* R. 374 at 26.) Conway's attempt to frame these actions as a single violation fails for each constitutes a discrete disciplinary action

7

that was independently actionable. (*See* R. 358 at 9–10). When each action occurred, it should have been immediately apparent to Conway that the retaliation he alleges was occurring. For instance, Conway alleges that, on March 20, 2018, he received a formal verbal reprimand and notice of progressive discipline related to the February 17, 2018, incident. (Defs.' Resp. to Pl.'s SOF ¶¶ 57.) But, under *Morgan*, this was an independently actionable retaliatory action.

The same is true of Conway's alleged reassignment and removal from the airfield. *Bass*, 746 F.3d at 840 ("Reassignment of duties and suspensions are discrete acts. Nothing about their duration or repetition changes their nature in such a way that a cumulative violation could arise.") Contrary to Conway's argument that this case is subject to the exception for hostile work environment claims provided in *Morgan*, Conway does not assert a claim "based on the cumulative effect of individual acts" as such requires. (R. 358 at 10 (citing to *Morgan*, 536 U.S. at 115); *see* Compl.) And his silence in that regard dooms any argument to the contrary. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011). Therefore, the continuous-violation rule does not apply. The Court will not consider actions occurring before August 24, 2018 in its analysis.

### 2. Whether Conway's speech was constitutionally protected.[5]

The Court now decides whether Conway can prove First Amendment retaliation. As mentioned, the first element is whether Conway engaged in constitutionally protected speech. This issue presents a question of law, even though it may require predicate factual determinations. *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). To be entitled to summary judgment on this element, Conway must establish that he "[spoke] as a citizen on a matter of public concern." *Clarke*, 574 F.3d at 377. But if the evidence shows that he did not, then the Individual Defendants are entitled to summary judgment on this claim. *See, e.g.*, *id.* Conway asserts that the reports he made describing Simos' February 17th request to update the airfield condition in (i) a letter to the FAA on September 20, 2018 (ii) a letter to the OIG on September 27th and (iii) an OSHA complaint on October 16th, were constitutionally protected as a matter of law. (Pl.'s Br. at 7–8; R. 358 at 13–15; R. 374 at 14.)[6] The Individual Defendants argue that Conway's report of the runway conditions to the FAA, OIG, and OSHA did not constitute a matter of public concern,

---

[5] The Individual Defendants argue that Conway should be barred from relying upon three of his alleged instances of constitutionally-protected speech because these were not properly disclosed before the conclusion of fact discovery. (R. 350 at 4–5.) Conway responds that the information was properly disclosed. (R. 358 at 9–11; R. 374 at 5–12.) As will become evident, this dispute is immaterial to the Court's resolution of the pending motions, and so it will not be addressed further.

[6] Conway also argues that filing the present action constituted protected activity. Even if true, the fact he filed it subsequent to the alleged retaliatory actions dooms a claim of retaliation based on this lawsuit itself. (*See* R. 374 at 26) (citing Defs.' Resp. to Pl.'s SOF ¶¶ 45–48 (describing events of February 2018), 57–63 (describing events of March and April 2018), 65–67 (describing events of July and June 2018).)

(R. 350 at 9–13), and that he did not speak as a private citizen. (R. 253 at 23–25.) Each argument is addressed in turn.

### a. The Overall Objective of Conway's Speech Did Not Address a Matter of Public Concern.

"Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 794 (7th Cir. 2016). "Whether a government employee's speech addresses a matter of public concern depends upon 'the content, form, and context of [the speech] as revealed by the whole record.'" *Metzger v. DaRosa*, 367 F.3d 699, 702 (7th Cir. 2004). But "speaking up on a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern[.]" *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999). Rather, only if the "overall objective or point of the speech, as ascertained by those three factors," was to "bring wrongdoing to light," rather than to "further some purely private interest," then the employee's speech was of a public concern. *Kubiak*, 810 F.3d at 483.

Additionally, "[t]he motive of the speaker is relevant as part of the context in which the speech was made but is not dispositive." *Id.* "[A] mere personal aspect of the speaker's motivation will not defeat the entire speech," *Kristofek*, 832 F.3d at 794, yet "speech 'for the sole purpose'" of bolstering [an employee's] stance in a private personnel dispute with [their] superiors . . . militate[s] against the conclusion that the employee's speech is entitled to First Amendment protection.'" *Metzger*, 367 F.3d

at 702 (citation omitted). For instance, in *Kristofek*, evidence of the plaintiff's self-interest in reporting his superior's misconduct was not outweighed by his desire to bring public malfeasance to light because "the record [did] not suggest that a reporter, investigator, or anyone else was inquiring into the matter." 832 F.3d at 795. The Seventh Circuit reasoned that there was no evidence that the plaintiff was "alerted . . . that potential punishment was [imminent]." *Id.*

Similarly, in *Gustafson*, despite the plaintiffs' speech "advancing some private interests when they raised concerns about [the defendants'] orders, the Seventh Circuit decided that "[the plaintiffs'] testimony made clear that they were also concerned about the fact that [the defendant's] order would [thwart efforts] to get a dangerous suspect off the streets and the department efforts in such cases more generally." 290 F.3d at 908. But no constitutional protection attaches to speech motivated "simply to further[ing] [the plaintiff's] own goal of expressing his displeasure with [a superior's] policies," *Kokkinis*, 185 F.3d at 844, "bolster[ing][an employee's] own position in a private personnel dispute with [their] superiors," *Metzger*, 367 F.3d at 702, or "focus[ing] solely on 'the personal effect upon'" the plaintiff. *Clarke*, 574 F.3d at 379 (quoting *Gustafson*, 290 F.3d at 908).

Here, starting with the content of Conway's speech, there is no genuine dispute that the accurate reporting of airline conditions has public importance. (R. 374 at 20; R. 350 at 9 (Individual Defendants acknowledging that "alleged safety violations at the airport may address a matter of public concern").) As to form, Conway's statements about Simos' February 17th request to update his airfield condition

11

reports were included in (i) a letter to the FAA on September 20th (ii) a letter to the OIG on September 27th and (iii) an OSHA complaint on October 16th. (Pl.'s Resp. to Defs.' SOF ¶¶ 63, 67; Defs.' Resp. to Pl.'s SOF ¶¶ 93–95.) That Conway made these statements outside of the ordinary chain of command tends to support an inference that the matter was of public concern. *See, e.g.*, *Kubiak*, 810 F.3d at 483 ("The fact that Kubiak's complaints about Zala were directed up the chain of command suggests that Kubiak's speech did not address a matter of public concern.").

But "none of the three factors is dispositive," and the context of Conway's speech shows that his overall objective was to bolster his position in a private personnel dispute with his superiors. *Kristofek*, 832 F.3d at 794. The evidence is that Conway made his first report regarding the February incident in September—seven months after the fact, yet only *days* after learning that he would be disciplined for his independent wrongdoing in a runway incursion. (Pl.'s Resp. to Defs.' SOF ¶¶ 60, 63.) These facts make this case distinguishable from *Kristofek* and *Gustafson* and analogous to *Clarke*, *Kokkinis*, and *Metzger*, where the plaintiffs' speech was ruled to be unprotected, as it shows Conway spoke solely to improve his standing in connection with imminent discipline. There is no evidence of any good reason why Conway waited seven months to report the February incident that would support concluding that public safety was his driving motivation. In contrast, the evidence that Conway blamed his runway incursion on Simos-related stress and promptly shared the cause of this stress with outside channels only once he faced prospective discipline for shortcomings in an unrelated aspect of his job only supports concluding

12

that Conway was motivated by self-preservation, nothing more. (Pl.'s Resp. to Defs.' SOF ¶ 59; Defs.' Resp. to Pl.'s SOF ¶ 74; Conway Dep. at 181:5–17, 394:14–396:6.)

Conway's rebuttal arguments are unavailing. (*See* R. 374 at 14–22.) He disputes the evidence that runway incursions are a serious violation subject to a minimum five-days suspension. (*See* Defs.' Resp. to Pl.'s SOF ¶¶ 104–106.) Conway also argues against the inference that he made these reports in the context of a dispute with his superiors because "reporting the City's violations would not have spared him the discipline anyway." (R. 374 at 21.) But, even granting Conway these inferences, this case remains materially indistinguishable from *Metzger*.

In *Metzger*, the court concluded that "the context of [the plaintiff's] reports undermine[d] any suggestion that her speech was of public concern." 367 F.3d at 702. The court reached this conclusion, not because it was certain that her reports would absolve her from certain punishment—but simply that she aimed "to protect herself from *potential* accusations that she had ignored or acquiesced in the violations" that she had alleged of her superiors. *Id.* (emphasis added). Equally here, Conway blamed his fault in the September 4th incident, in part, on the combination of the stress caused by the fear of Simos' return to work, the weather conditions that day, and the chance that Simos might again ask him to falsify the weather conditions. (*See* Pl.'s Resp. to Defs.' SOF ¶ 59; Defs.' Resp. to Pl.'s SOF ¶ 74.) Even if the facts are viewed in a light most favorable to Conway, the contextual evidence only supports concluding that Conway's objective in making the reports of the February conflict was to create

13

a documentary record of the incident causing the stress that he claimed caused the September 4th incident, not a matter of public concern.

### b. Conway Did Not Speak as a Private Citizen.

Although the conclusion that Conway cannot establish that he spoke on a matter of public concern dooms his First Amendment retaliation claim, the Court will also illustrate why Conway also did not speak as a private citizen. "The Supreme Court has held that 'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'" *Kubiak*, 810 F.3d at 481 (citation omitted). "The 'inquiry is a practical one' that goes beyond a written job description" and "'[t]he employee's official duties include both formal job requirements' and 'the employer's real rules and expectations.'" *Davis v. City of Chicago*, 889 F.3d 842, 845 (7th Cir. 2018) (citations omitted). Relevant considerations include whether "[his] speech was intimately connected with [his] job," *Kubiak*, 810 F.3d at 482, and whether the speech constitutes "'government employees' work product' that has been 'commissioned or created' by the employer[.]" *Kristofek*, 832 F.3d at 793 (citation omitted).

Moreover, when an employee is given an order pursuant to his official duties, even a refusal to comply with that order constitutes speech as a public employee. *Davis*, 889 F.3d at 845. In *Davis*, for example, the plaintiff "was responsible for revising his reports at the direction of his superiors" and so his refusal to make the change at his supervisor's order constituted speech pursuant to his official duties. *Id*. Relatedly, speech reporting misconduct observed pursuant to an employees' official

14

duties has repeatedly been held to have been made pursuant to official duties. *Ulrey v. Reichhart*, 941 F.3d 255, 259 (7th Cir. 2019) (collecting cases).

Here, it is undisputed that Conway's job duties included monitoring and reporting runway conditions at Midway. (Defs.' Resp. to Pl.'s SOF ¶ 2; Pl.'s Resp. to Defs.' SOF ¶ 24.) What Conway reported to the FAA, OIG, and OSHA was that he disagreed with Simos' February 17th request to update the airfield conditions, and that he was being retaliated against for opposing that order. (Pl.'s Br. at 7–8; R. 358 at 13–15; R. 374 at 14.) The conclusion that this speech was intimately connected to Conway's official duties "is straightforward." *Davis*, 889 F.3d at 845. Given that this speech exists because of what he observed pursuant to his job duties, Conway did not speak as a private citizen. That he reported the alleged misconduct or abuse does not alter the character of his speech; the Seventh Circuit has "repeatedly rejected such claims for a whistleblower carve-out from the category of unprotected employee speech." *Ulrey*, 941 F.3d at 259.

Once again, Conway's arguments to the contrary are not persuasive. He argues that *Davis* "is irrelevant" because Conway was responsible for assessing runway conditions independently, and that the plaintiff in *Davis* "was responsible for revising his reports *at the direction of his superiors*." (R. 358 at 14 (emphasis in original.) But *Davis*' holding was not so narrow; indeed, Conway's argument cannot be squared with the Seventh Circuit's guidance that this "inquiry is a practical one." 889 F.3d at 845. For example, in *Lett v. City of Chicago*, 946 F.3d 398, 401 (7th Cir. 2020), applying *Davis*, the court emphasized that the plaintiff's refusal to amend the investigative

15

reports was not protected because it "was 'speech that owe[d] its existence' to his professional responsibilities." *Lett*, 946 F.3d at 401. Just as in *Lett* and *Davis*, Conway's opinion as to the proper conditions owes its very existence to his performance of his duty to assess runway conditions; he did not speak privately.

Lastly, Conway argues that disputed facts preclude summary judgment because the parties disagree whether Logan "ultimately agreed to change the conditions as Simos ordered." (R. 358 at 14.) Even if there was some dispute as to this, it would be immaterial. Since Conway was "not speaking as [a] citizen[] for First Amendment purposes, . . . the Constitution does not insulate [his] communications from employer discipline." *Cage*, 42 F.4th at 742. The Court takes no view of whether the evidence supports concluding that Conway suffered a deprivation, but if he did, in the absence of any proof that Conway engaged in constitutionally protected speech, such would not offend the constitution. In sum, as a matter of law, Conway did not speak as a private citizen on a matter of public concern. His motion for summary judgment is therefore denied, and the Individual Defendants' motion is granted.

### B. *Monell* Liability

In *Monell*, the Supreme Court held that local governmental entities are "persons" under § 1983. 436 U.S. 658, 690 (1978). Accordingly, "local governments like [the City] can be held responsible for constitutional violations only when they themselves cause the deprivation of rights." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020). But "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Doxtator v. O'Brien*, 39 F.4th 852, 864 (7th Cir. 2022). Conway's failure to establish that the Individual

Defendants committed a constitutional violation is therefore fatal to his claim against the City. *See, e.g. id.* at 864–65 (affirming district court's grant of summary judgment to municipality because the district court properly dismissed the claim against the police officer). Accordingly, the City's motion for summary judgment on Conway's *Monell* claim is granted.

## II.   ILLINOIS WHISTLEBLOWER ACT

The defendants also move for summary judgment on Conway's Illinois Whistleblower Act ("IWA") claim. (Compl. ¶¶ 152–62; R. 252 ¶ 7.) "The general rule, when the federal claims fall out before trial," however, "is that the district court should relinquish jurisdiction over any supplemental . . . state law claims in order to minimize federal judicial intrusion into matters of purely state law." *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015) (citation omitted). "[O]nly in 'unusual cases' may a district court exercise its discretion to assert its supplemental jurisdiction based upon the balance of the factors of 'judicial economy, convenience, fairness and comity.'" *Id.* (citation omitted). Having considered the applicable factors, the Court sees no reason to continue exercising jurisdiction over Conway's state-law claim. The IWA claim is therefore dismissed without prejudice. *See, e.g.*, *Jain v. Bd. of Educ. of Butler Sch. Dist. 53*, 366 F. Supp. 3d 1014, 1021 (N.D. Ill. 2019).

## CONCLUSION

The plaintiff's motion to seal [349] is granted. The plaintiff's corrected partial motion for summary judgment [324] is denied for the reasons stated in this memorandum opinion and his partial motion for summary judgment [303] is denied as moot in light of his corrected motion. The defendants' motion for summary

judgment [252] is granted as to Conway's First Amendment retaliation claim. The Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the plaintiff's Illinois Whistleblower Act claim; it is dismissed without prejudice. Civil case terminated.

Date: March 31, 2025

JEREMY C. DANIEL
United States District Judge